IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| AMERICAN CIVIL RIGHTS UNION, | § | |
| in its individual and corporate capacities, | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No. 7:16-CV-00103 |
| | § | |
| ELECTION ADMINISTRATOR | § | |
| JOHN RODRIGUEZ, in his official | § | |
| capacity; and TEXAS SECRETARY OF | § | |
| STATE ROLANDO PABLOS, in his | § | |
| official capacity, | § | |
| *Defendants.* | § | |

## APPENDIX TO DEFENDANT JOHN RODRIGUEZ'S MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| Deposition of ACRU President Susan Carleson | Tab A |
| Receipts Related to Advertisement and Travel Costs (ACRU 70-84) | Tab B |
| Affidavit of John Rodriguez, Starr County Elections Administrator | Tab C |
| *Bellitto v. Snipes*, 268 F.Supp.3d 1328 (2017) | Tab D |
| Report of John Mashburn to Susan Carleson (ACRU 766-774) | Tab E |

# TAB A

Page 1

1       UNITED STATES DISTRICT COURT

2     FOR THE SOUTHERN DISTRICT OF TEXAS

3         MCALLEN DIVISION

4  AMERICAN CIVIL RIGHTS UNION,    )

5  in its individual and           )

6  corporate capacities,           )

7      Plaintiff,                   )

8      v.            )  Civil Action

9  No.

10 ELECTION ADMINISTRATOR         )  7:16-CV-00103

11 JOHN RODRIGUEZ, in his official  )

12 capacity; and TEXAS SECRETARY   )

13 OF STATE ROLANDO PABLOS,        )

14 in his official capacity        )

15 Defendant.              )

16

17

18           Washington, D.C.

19        Monday, December 11, 2017

20   Deposition of SUSAN CARLESON - 9:30 A.M.

21

22

Page 2

1  DEPOSITION OF  SUSAN CARLESON

2      Held at

3      Army Navy Club

4      901 17th St NW

5      Washington, DC 20006

6        Pursuant to notice, before Carol J.

7  Robinson, Registered Professional Reporter and Notary

8  Public in and for the District of Columbia.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 3

1          A P P E A R A N C E S

2  ON BEHALF OF THE PLAINTIFF:

3  J. CHRISTIAN ADAMS, ESQ.
   PUBLIC INTEREST LEGAL FUND
4  300 N. Washington Street - Suite 405
   Alexandria, Virginia 22314
5  703-963-8611
   adams@publicinterestlegal.org
6

7  ON BEHALF OF DEFENDANT JOHN RODRIGUEZ

8  PHILIP ARNOLD, ESQ.
   ALLISON, BASS & MAGEE, L.L.P.
9  A.O. Watson House
   402 West 12th Street
10 Austin, Texas 78701
   512-482-0701
11 p.arnold@allison-bass.com

12 ON BEHALF OF DEFENDANT PABLOS

13 ADAM BITTER, ESQ.
   Assistant Attorney General
14 Office of the Texas Attorney General
   General Litigation Division
15 P.O. Box 12548
   Austin, Texas 78711
16 adam.bitter@oag.texas.gov

17

18

19

20          CONTENTS

21 EXAMINATION OF SUSAN A. CARLESON        PAGE

22   By Mr. Arnold

Page 4

1         E X H I B I T S

2        (Marked - Attached)

3  Number     Description           PAGE

4  Exhibit 1    Stack of letters from ACRU to     25

5  various counties in Texas, Bates

6  stamped ACRU-000001-69

7  Exhibit 2    Document entitled "Financial      32

8  Statements and Independent

9  Auditor's Report," dated

10 December 16, 2016,

11 Exhibit 3    Email from John Mashburn to       47

12 Susan Carleson dated

13 February 8, 2016 with attached

14 receipts, Bates stamped

15 ACRU-000072-84

16 Exhibit 4    Document entitled "Best Practices  56

17 for Achieving Integrity in Voter

18 Registration"

19 Exhibit 5    Email from Jorge Canales at       64

20 Starr County Town Crier to

21 Stacey Cornett dated December 23,

22 2015, Bates stamped ACRU-00007071

Page 5

1  Number        Description              PAGE
2  Exhibit 6     Printout from ACRU web site      80
3               entitled "Mission Statement"

Page 6

1                P-R-O-C-E-E-D-I-N-G-S
2                    SUSAN CARLESON
3  called as a witness, having been first duly sworn to
4  tell the truth, the whole truth, and nothing but the
5  truth, was examined and testified as follows:
6                    EXAMINATION
7  BY MR. ARNOLD:
8      Q.    Would you state your name for the record,
9  please?
10     A.    Susan Alison Carleson.
11     Q.    And where do you work, Ms. Carleson?
12     A.    I work for the American Civil Rights
13  Union.
14     Q.    What is your position at the American
15  Civil Rights Union?
16     A.    I'm the Chairman and CEO.
17     Q.    Have you ever been deposed before?
18     A.    Yes, I have.
19     Q.    Approximately how many times have you
20  been deposed?
21     A.    Twice.
22     Q.    What were you deposed in connection with?

Page 7

1      A.    I was deposed in connection with our
2  lawsuit against Zavala County, Texas and also a
3  lawsuit against Broward County, Florida.
4      Q.    And those are the only two times you have
5  been deposed?
6      A.    Yes.
7      Q.    Same basic ground rules, I'm sure, as in
8  those depositions.  If you want to take a break, we
9  can take a break whenever.  If you have any questions
10  or you didn't understand a question I asked, just ask
11  me to repeat it.
12         If you would let me finish a question
13  before answering it so we don't talk over each other,
14  for the stake of the court reporter, who always gets
15  mad when we do that.
16         What is -- how long have you been the
17  president of the American Civil Rights Union?
18     A.    I became president of the ACRU on the
19  passing of my husband.
20     Q.    Who was your husband?
21     A.    Robert B. Carleson.
22     Q.    Did he found the ACRU?

Page 8

1      A.    Yes, he did.
2      Q.    By ACRU, we mean the American Civil
3  Rights Union?
4      A.    American Civil Rights Union.
5      Q.    When did he found the ACRU?
6      A.    He founded it technically in 1998.  The
7  IRS gave us our letter of determination in 1999.
8      Q.    Was there any issue with the IRS giving
9  you your letter of determination as a 501(c)(3)?
10     A.    No, there was not.
11     Q.    What did you do before you became
12  president of the ACRU?
13     A.    I had a long career in public policy both
14  on Capitol Hill and in various executive
15  administrations.
16     Q.    What did you do immediately prior to
17  becoming president of the ACRU?
18     A.    I was a -- I had a political appointment
19  at the Social Security Administration, the Office of
20  the Commissioner.
21     Q.    What was that title?
22     A.    I was Special Assistant for Policy.

Page 9

1    Q.    What did you do as Special Assistant for

2  Policy at the Social Security Administration?

3    A.    I helped develop policy objectives and

4  basically generally anything that related to any of

5  the upcoming policy decisions that the Commissioner

6  was going to be making.

7    Q.    Was that part of a committee or panel?

8    A.    No. I am an employee.

9    Q.    Who appointed you?

10   A.    George W. Bush.

11   Q.    What did you do before you worked for the

12 Social Security Administration?

13   A.    Immediately before?

14   Q.    Yes, ma'am.

15   A.    I sold real estate in San Diego,

16 California.

17   Q.    How long did you sell real state in San

18 Diego?

19   A.    Well, my husband and I lived there for

20 about nine years.

21   Q.    When did you move to Washington, D.C.?

22   A.    Moved back 2002.

Page 10

1    Q.    So, from approximately 1992 to 2002, you

2  lived in San Diego?

3    A.    That's correct.

4    Q.    Did you work for a real estate company in

5  San Diego?

6    A.    Yes.

7    Q.    What real estate company?

8    A.    Coldwell Banker.

9    Q.    What did you do prior to working as a

10 real estate agent?

11   A.    I worked for the Reagan Administration in

12 the capacity of a Special Assistant to the Assistant

13 Attorney General for Justice Programs, and I had

14 worked on Capitol Hill for Jack Kemp.

15       I had many years of experience.  My last

16 formal position here before I left -- before we moved

17 to California was with the DOJ in the second Reagan

18 Administration.

19   Q.    What did you do at the DOJ before you

20 moved to California?

21   A.    I was Special Assistant to the Assistant

22 Attorney General for Justice Programs.

Page 11

1    Q.    What did that entail?

2    A.    We had a variety of programs that fell

3  under his purview, the Institute for Justice,

4  basically did writing for him and assisted in

5  formulating policy.

6    Q.    What specific -- let me rephrase the

7  question.

8        Were there any specific policies he

9  focused on or was it general policy for the DOJ?

10   A.    It was generally related to the Office of

11 Justice Programs, the programs under him, Bureau of

12 Justice Statistics, crime rates, state and local

13 administration; the office of OGP had a broad

14 portfolio.

15   Q.    Okay.  And I'm not trying to be obtuse,

16 but could you tell it to me a little more?  My

17 knowledge of the federal government is a little

18 limited.  You are throwing out some terms I just

19 don't understand.

20       MR. ADAMS:  Objection, vague.

21 BY MR. ARNOLD:

22   Q.    If you could just explain what that

Page 12

1  office did maybe in more detail?

2    A.    Well, the office oversaw a number of

3  bureaus, the Bureau of Justice Assistance, the Bureau

4  of Juvenile Justice, the Bureau of Victims -- I think

5  it was Victims Assistance.  These names may have

6  changed by now.

7        It was mostly the statistical information

8  about crime rate nationally, statewide, locally, and

9  my job was to do whatever he asked me to do, mostly

10 preparing comments for him and policy papers.

11   Q.    And prior to that, I forgot what you say

12 you did before the DOJ.

13   A.    I had been with the Deputy Assistant of

14 Education under Secretary of Education.

15   Q.    Was that also in the Reagan

16 Administration?

17   A.    That was.  And I was detailed to the

18 Commission on the Bicentennial of the Constitution.

19   Q.    Who was the Secretary of Education at the

20 time?

21   A.    Bill Bennett.

22   Q.    What did you do for Kemp's office?

Page 13

1    A.    I was his legislative director.

2    Q.    How long were you legislative director?

3    A.    About a year and a half.

4    Q.    What did you do before working for

5    Senator Kemp?

6    A.    I was staff on the Commission on the

7    Social Security for the Greenspan Commission, Social

8    Security reform, 1981 to 1983.

9    Q.    Where did you -- where were you born?

10    A.    Hartford, Connecticut.

11    Q.    Where did you go to college?

12    A.    I went briefly to a junior college in

13    Boston. I did not graduate.

14    Q.    Do you hold any other degrees or

15    certifications?

16    A.    No. Certification, I became a member of

17    MENSA in 1968.

18    Q.    You have a real estate license or did at

19    one point?

20    A.    I did.

21    Q.    Do you still?

22    A.    No, I don't.

Page 14

1    Q.    Did you hold any other licenses?

2    A.    No.

3    Q.    How many people work for the ACRU?

4    A.    We have about six or eight staff and then

5    I contract with an accounting firm, a web site

6    designer, graphic, an auditor. There are various

7    other groups -- firms that I contract with. But

8    individuals who actually work for ACRU, about six or

9    seven.

10    Q.    Do you oversee all six to seven people as

11    president?

12    A.    Yes. I delegate as much as I can.

13    Q.    What is the primary purpose of the ACRU?

14    A.    Well, the purpose -- my husband founded

15    the organization to defend the constitutional rights

16    of all Americans.

17    Q.    Did he have any specific goals?

18    A.    He felt that things were not represented

19    fully in favor of certain groups. At the time, he

20    felt there was a need for an organization to defend

21    the Constitution as written and defend particular

22    cases.

Page 15

1    At the time, there were cases against the

2    Boy Scouts of America and their freedom of

3    association, and that was the first case that we

4    filed an Amicus brief in, in 1999.

5    Q.    What specifically does the ACRU -- let me

6    rephrase the question.

7    What is the ACRU's mission statement and

8    goal today?

9    A.    Well, our mission statement is to protect

10    the civil rights of all Americans and we have

11    concluded that the most essential civil right that we

12    have is that of self-governance. And the key to that

13    is honest elections.

14    Q.    Is the ACRU primarily focused on election

15    integrity in elections law?

16    A.    Yes.

17    Q.    Is there anything else the ACRU focuses

18    on?

19    A.    Well, we from time to time submit Amicus

20    briefs in other areas, but as we are a relatively

21    small organization, I feel that it's important for us

22    to focus and do our best job on the election

Page 16

1    integrity issue, which I believe is the lynchpin of

2    all of our rights.

3    Q.    What does the ACRU primarily spend its

4    money on?

5    MR. ADAMS: Objection. Asked and

6    answered.

7    THE WITNESS: Lawsuits. Lots of legal

8    expenses.

9    BY MR. ARNOLD:

10    Q.    Legal expenses?

11    A.    Yes.

12    Q.    Those are primarily related to or I guess

13    exclusively related to elections, integrity lawsuits?

14    A.    Litigation and also our staff costs.

15    Q.    Could you describe to me the ACRU's daily

16    activities, general activities that the ACRU engages

17    in from day to day?

18    MR. ADAMS: Objection to form. Vague.

19    BY MR. ARNOLD:

20    Q.    Do you understand the question?

21    A.    Yes. I'll do my best to answer. On any

22    given day, there are a variety of things going on.

Page 17

1 **We are constantly researching to find instances of**
2 **problems with our election system, instances of vote**
3 **fraud. We compile videos. We get them posted.**
4     **There is a production process. There is**
5 **writing going on. We have a very active web site.**
6 **We post new material that is generated by ACRU**
7 **fellows and policy board members, I'd say, daily,**
8 **sometimes more than daily.**
9     **We are -- I believe right now, we are**
10 **working on an Amicus brief in at least one case,**
11 **perhaps two. I am currently working on our 2018**
12 **budget. So, there are a variety of things going on**
13 **every day.**
14    Q.   Tell me about the -- you mentioned
15 analyzing elections issues, and, I guess, voter
16 registration issues. What sort of routine activities
17 do you all engage in for that?
18    **A.   We don't do analyses ourselves. We**
19 **depend upon the experts.**
20    Q.   What experts?
21    **A.   Steven Camarota, C-A-M-A-R-O-T-A and he**
22 **has done the analysis of the voter registration**

Page 18

1 **rolls. We don't do our own analysis. We depend upon**
2 **the analysis of experts.**
3    Q.   Mr. Camarota was hired as an expert in
4 this case. Correct?
5    **A.   Yes.**
6    Q.   And I believe he's been hired as an
7 expert in some other cases you have been involved in.
8 Correct?
9    **A.   Yes. I would say that he is the most**
10 **expert in this field available.**
11    Q.   Do you all routinely engage him as an
12 expert witness in litigation?
13    MR. ADAMS:  Objection. Form. Vague.
14 BY MR. ARNOLD:
15    Q.   Let me ask the question a different way.
16 Does Mr. Camarota do other work for you besides
17 testifying as an expert?
18    **A.   For us specifically, no, but he does the**
19 **analysis of the data which we use.**
20    MR. ADAMS:  Objection. Form. Vague to
21 the previous question.
22 BY MR. ARNOLD:

Page 19

1    Q.   Let me rephrase the question a little
2 bit. Who determines who the ACRU should sue for
3 having voter roll issues, I guess?
4    **A.   Well, the ultimate decision is mine, and**
5 **it's based on consultations with -- well, it's based**
6 **on studying -- looking at the data, taking into**
7 **consideration our budget, and consulting with, from**
8 **time to time, members of the policy board, and that's**
9 **how I arrive at a decision.**
10    Q.   Who helps you with the analysis to
11 determine this state or this county is having issues
12 with voter fraud?
13    **A.   Well, the numbers are relatively**
14 **straightforward. It's a simple calculation that**
15 **shows how much over 100 percent a county's voter**
16 **registration rolls are. So, it's really not terribly**
17 **complicated.**
18    Q.   I understand the math and I have read Mr.
19 Camarota's report in this case. Does he identify
20 these counties and states for you or is there
21 somebody in your office?
22    MR. ADAMS:  Objection. Compound.

Page 20

1    THE WITNESS:  There is a list of
2 counties.
3 BY MR. ARNOLD:
4    Q.   Who provided a list of counties?
5    **A.   Mr. Camarota.**
6    Q.   So, Mr. Camarota was engaged to do a
7 nationwide analysis to identify counties that had
8 more registered voters than people of voting age
9 population?
10    MR. ADAMS:  Objection. Asked and
11 answered.
12    THE WITNESS:  Uh-huh. I guess. I didn't
13 engage him to do the study.
14 BY MR. ARNOLD:
15    Q.   Do you know who did engage him to do the
16 study?
17    **A.   I don't know.**
18    Q.   No?
19    **A.   No.**
20    Q.   How did you acquire the study?
21    MR. ADAMS:  Objection. Asked and
22 answered.

Susan Carleson

Page 21

1    THE WITNESS:  I don't know.  I have

2  access to the study.  I have access to the

3  information.  It's public information.  It's not

4  secret.

5  BY MR. ARNOLD:

6    Q.   Okay.  Who gave you this?

7    MR. ADAMS:  Objection.  Asked and

8  answered.

9  BY MR. ARNOLD:

10    Q.   Who provided the ACRU Mr. Camarota's

11  national study?

12    **A.   Who?  I don't recall specifically who.**

13    Q.   Do you know when the study was created?

14    **A.   I believe that the data reflected in that**

15  **study was through 2013.**

16    Q.   Do you have a copy of the study?

17    **A.   Not with me.**

18    Q.   Does the ACRU possess a copy of the

19  study?

20    **A.   Yes.**

21    Q.   We went over your professional experience

22  before back to, at least, I think, 1981.  Correct?

Page 22

1    **A.   Yes.**

2    Q.   I didn't hear that you had ever worked as

3  an elections administrator, an elections official.

4  Is that right?

5    **A.   That correct.**

6    Q.   Do you have any experience with Texas

7  elections law?

8    **A.   I have reviewed the documents in this**

9  **case and other filings that we have made.  I wouldn't**

10  **say that I'm an expert, but I'm familiar with it.**

11    Q.   Do you have any experience with federal

12  elections law?

13    **A.   To the extent that I have needed to**

14  **become acquainted with it.**

15    Q.   Have you read the National Voter

16  Registration Act?

17    **A.   I have not committed it to memory.  I**

18  **have read it, particularly Section 8.**

19    Q.   Is Section 8 primarily the section of the

20  -- can we call it the NVRA, the National Voter

21  Registration Act?

22    **A.   Yes.**

Page 23

1    Q.   The Section 8 of the NVRA is primarily

2  what the ACRU focuses on.  Is that right?

3    **A.   That's correct.**

4    Q.   And you've read Mr. Camarota's report in

5  this case.  Correct?

6    **A.   Yes, I have.**

7    Q.   And you've read Donald Palmer's report in

8  this case.  Correct?

9    **A.   Yes, I have.**

10    Q.   What are your opinions about Mr.

11  Camarota's report?

12    MR. ADAMS:  Objection.  Relevance.  Calls

13  for a legal conclusion.

14  BY MR. ARNOLD:

15    Q.   Do you have any opinions about Mr.

16  Camarota's report?

17    **A.   My opinion is that it was -- it was**

18  **straightforward.  He did a simple calculation that**

19  **resulted in showing that Starr County's voter**

20  **registration rolls were well above not only the**

21  **average of Texas but nationwide.**

22    Q.   How many of Mr. Camarota's reports have

Page 24

1  you read?

2    **A.   Well, I have read the ones that we have**

3  **contracted with him to provide to us.  I am not privy**

4  **to reports he's done for others.**

5    Q.   And the reports Mr. Camarota has provided

6  to you are his nationwide survey.  Correct?

7    **A.   Yes.**

8    Q.   The expert report in this case against

9  Starr County.  Correct?

10    **A.   Yes.**

11    Q.   The expert report against Zavala County

12  in Texas.  Correct?

13    **A.   Yes.**

14    Q.   And the expert report against Broward

15  County in Florida.  Correct?

16    **A.   Yes.**

17    Q.   Were there any others?

18    MR. ADAMS:  Objection.  Asked and

19  answered.

20    THE WITNESS:  I do not believe so.

21  BY MR. ARNOLD:

22    Q.   Did Mr. Camarota prepare a report --

Page 25

1  strike the question.
2      Let me mark this as Exhibit is 1.
3      (Carleson Exhibit No. 1,
4      stack of letters from ACRU to
5      various counties in Texas, Bates
6      stamped ACRU-000001-69, was
7      marked for identification.)
8  BY MR. ARNOLD:
9      Q.   This has been Bates labeled ACRU 1 to
10 ACRU 69.  This was provided to us by your counsel.
11 And it is essentially a stack of letters that you
12 sent to various counties in Texas.
13     A.   Yes.
14     Q.   And the letters are mostly the same.  Of
15 course, the recipient name has changed but they
16 appear to be a form letter.  Is that right?
17     A.   That's correct.
18     Q.   Who prepared this letter for you?
19     A.   This letter, I believe, was drafted by
20 John Mashburn.
21     Q.   And Mr. Mr. Mashburn used to work for the
22 ACRU, I understand.

Page 26

1      A.   Yes, he did.
2      Q.   How did you determine what counties in
3  Texas to send these letters to?
4      MR. ADAMS:  Objection.  Asked and
5  answered.
6      THE WITNESS:  All of these counties had
7  in excess of 100 percent of their citizen voter
8  registration population registered to vote.
9  BY MR. ARNOLD:
10     Q.   And that came from Mr. Camarota's report.
11 Correct?
12     A.   Yes.  I believe so.
13     Q.   So, when you send these letters, you rely
14 on the data Mr. Camarota has provided to you.
15 Correct?
16     MR. ADAMS:  Objection.  Asked and
17 answered.
18     THE WITNESS:  Yes.
19 BY MR. ARNOLD:
20     Q.   Is there any other data you rely on?
21     A.   No.
22     MR. ADAMS:  Objection.  Form.  Vague.

Page 27

1  BY MR. ARNOLD:
2      Q.   Would you agree with me that as part of
3  its regular activities, the ACRU analyzes county
4  voter registration rolls and compares the number of
5  registered voters to the voting age population of
6  that county?
7      A.   Well, we pay attention to the report.  We
8  don't generate the report.  We don't crunch the
9  numbers.
10     Q.   But it is something the ACRU does as part
11 of its routine business?
12     A.   Yes.  We try to stay on top of it.
13     Q.   What percent of incorrectly registered
14 voters do you think is reasonable for a county to
15 have on its voting registration roll?
16     MR. ADAMS:  Objection.  Form.  Vague and
17 calls for a legal conclusion.
18     THE WITNESS:  I would say none.
19 BY MR. ARNOLD:
20     Q.   So, in your opinion, it's not reasonable
21 for one person to be registered incorrectly on a
22 county's voter registration roll?

Page 28

1      MR. ADAMS:  Objection.  Asked and
2  answered.
3      THE WITNESS:  I believe it is the
4  responsibility of the county to do its very best job
5  to make sure that there are none.  Obviously, this is
6  real life and there are going to be errors, but I
7  believe it's the county's responsibility to minimize
8  the possibility of those errors affecting the process
9  to the extent it possibly can.
10 BY MR. ARNOLD:
11     Q.   I understand that and that's what I'm
12 getting at, is the fact that we live in the real
13 world and there's going to be issues.  So, you're not
14 taking a hard line saying no, absolutely, 100
15 accurate in every county in the United States.
16     A.   The ideal is none.
17     Q.   The ideal is none, but reality would
18 dictate that there's going to be at least one
19 somewhere?
20     A.   Probably.
21     Q.   Do you know what the Social Security
22 Master Death Index is?

Page 29

1    A.    Yes.

2    Q.    What is it?

3    A.    It's the Social Security's Master Death

4    Index.    Everyone who dies is recorded in the Social

5    Security Department.    It's one of the processes they

6    use to stop sending checks to people.

7    Q.    Did you work with the Social Security

8    Master Death Index when you worked at the Social

9    Security Administration?

10    A.    No, I didn't.

11    Q.    Were you familiar with it through your

12    role at the Social Security administration?

13    A.    Everyone was aware of its existence, yes.

14    Q.    But you didn't actively participate in

15    it?

16    A.    No.

17    MR. ADAMS:  Objection.  Asked and

18    answered.

19    BY MR. ARNOLD:

20    Q.    Have you ever used the Social Security

21    Master Death Index personally?

22    A.    No.

Page 30

1    Q.    Do you know how much it cost to use the

2    Social Security Master Death Index?

3    A.    I do not.

4    MR. ADAMS:  Objection.  Relevance.

5    BY MR. ARNOLD:

6    Q.    Do you know how many states use the

7    Social Security Master Death Index?

8    A.    No, I do not.

9    Q.    Do you know what the National Change of

10    Address Program is?

11    A.    Yes, I do.

12    Q.    What is that?

13    A.    That's the U.S. Postal Service's program;

14    when people are moving, they notify the Post Office

15    and mail is returned to the sender with the person's

16    new address attached to it. I get return mail from

17    some of the our donors with the yellow sticker on it,

18    and we go ahead and make the address change to make

19    sure that the person gets the mail going forward.

20    Q.    Have you ever personally used the

21    National Change of Address database?

22    A.    Personally, no.

Page 31

1    Q.    Do you know how much it cost to use the

2    National Change of Address database?

3    A.    No, I do not.

4    Q.    Do you know how many states use the

5    National Change of Address database?

6    A.    Not personally, no.

7    Q.    What injury did the ACRU suffer as a

8    result of the Starr County elections administrator's

9    actions as you allege in this case?

10    A.    Well, we spent a great deal of money in

11    attempting to solve the problem with Starr County.

12    When we sent the notice letter, we ended up sending

13    Mr. Mashburn on a trip to meet with Mr. Montalvo.

14    That was over $7,000.

15    We also took out a newspaper ad in the

16    local paper, attempting to raise public awareness

17    that we felt there were problems with the voter

18    rolls.  So, we spent a substantial amount of money

19    for an organization with a budget the size of ours.

20    Q.    How big is the ACRU's budget?

21    MR. ADAMS:  Objection.  Form.

22    THE WITNESS:  Our operating budget

Page 32

1    outside of the direct mail costs and everything is a

2    little over $1 million a year.

3    (Carleson Exhibit No. 2,

4    document entitled "Financial

5    Statements and Independent

6    Auditor's Report," dated December

7    16, 2016, was marked for

8    identification.)

9    BY MR. ARNOLD:

10    Q.    I am handing you Exhibit 2.  This is -- I

11    just got it off the web site.  Is this your -- it

12    looks like a 2016, 2015 audit, and there is an

13    additional group of documents about the 2016 budget.

14    A.    Uh-huh.  Is there anything particular you

15    want me to look at?

16    Q.    No.  I just want to make sure that is an

17    accurate reflection of your budget.

18    A.    Well, it's our financial report.  When

19    I'm talking about our budget, I'm talking about the

20    numbers with which I operate, and that's slightly

21    over a million dollars.  When we take into account

22    direct mail costs and what not, it is more like

Page 33

1  $4 million.

2      Q.   What are the direct mail costs?

3      **A.   Well, they send mail out to donors.**

4  **There are costs involved with that.  And then there**

5  **are returns so there an offset.  I thought you were**

6  **interested in my operating budget, organization.**

7      Q.   I am just trying to get an idea.

8      **A.   And I don't think that number is actually**

9  **reflected in here.  These are kind of the gross**

10 **numbers.  So, probably 4 and a half million is closer**

11 **to the number that would pop out here.  But it's**

12 **complicated.**

13     Q.   Okay.  Exhibit 2 reflected around

14 $1 million sort of budget and you are saying there is

15 an additional 3 million you all incur in mailings?

16     **A.   Well, there are expenses with direct**

17 **mail.  They spend money.  They recoup money.  But**

18 **technically, it's part of the budget but it's outside**

19 **of my --**

20          MR. ADAMS:  Can we take a break?

21          THE WITNESS:  I'm not an accountant so

22 I'm not really sure --

Page 34

1          MR. ADAMS:  Can we look at this during

2  the break?

3          MR. ARNOLD:  Sure.  I just want to let

4  her finish answering the question.

5  BY MR. ARNOLD:

6      Q.   Are you done with answering the question?

7      **A.   Salary, expenses things that I actually**

8  **write checks for and pay, it is approximately**

9  **$1 million a year.**

10         MR. ARNOLD:  Thank you.

11         (Recess taken.)

12 BY MR. ARNOLD:

13     Q.   Before the break, we were talking about

14 the budget in Exhibit 2.  When we were talking about

15 the mailings, you used the word "they."  Who is

16 "they"?

17     **A.   We contract with two firms.**

18     Q.   Who are the firms?

19     **A.   American Target Advertising and HSP**

20 **Direct.**

21     Q.   And they do your, I guess, mass mailings

22 for you?

Page 35

1      **A.   It is our outreach, our globalization**

2  **mailings, yes.**

3      Q.   What do they mail specifically?

4      **A.   They explain to people what we're doing**

5  **and ask them if they want to become a member and join**

6  **our effort.**

7      Q.   So, solicitation for membership?

8      **A.   Yes, and education, telling them what we**

9  **are doing and why we are doing it.**

10     Q.   And you said the ACRU spends roughly

11 $3 million a year on the mailings?

12     **A.   That amount of money is expended.  I**

13 **believe the documents show that.**

14     Q.   What do you mean that amount is money is

15 expended?

16     **A.   It's the cost of mailing the materials.**

17     Q.   Okay.  So, before, you said the injury

18 that ACRU incurred in this case with Starr County was

19 the expense to send Mr. Mashburn down to Starr County

20 and the expense to run a newspaper ad.  Is that

21 correct?

22     **A.   Uh-huh.**

Page 36

1      Q.   Were there any other expenses that ACRU

2  incurred in this case before they filed a petition?

3      **A.   Well, specific to Starr County?**

4      Q.   Yes, ma'am.

5      **A.   I don't believe so, but the fact that**

6  **there are inaccurate voter rolls is an ongoing**

7  **expense for us in our effort to educate people, to**

8  **mobilize people to do something about it.  So, there**

9  **would be an expense there.**

10     Q.   Do you recall when you sent the notice

11 letter to Mr. Montalvo in this case?

12     **A.   December 23, 2015.**

13     Q.   Do you know when Mr. Mashburn traveled to

14 Starr County?

15     **A.   January 26, 2016.**

16     Q.   So, approximately a month later, Mr.

17 Mashburn visited Starr County?

18         MR. ADAMS:  Objection.  Asked and

19 answered.

20         THE WITNESS:  That's correct.

21 BY MR. ARNOLD:

22     Q.   Have you ever sent a notice letters like

Page 37

1  we see in Exhibit 1 to only state elections officials

2  and not to county election officials?

3      **A.  No, I have not.**

4      Q.  And I see on the letters that make up

5  Exhibit 1, they are directed to county election

6  officials and then carbon copy to the Texas Secretary

7  of State.  Is that correct?

8      **A.  That's correct.**

9      Q.  And is that to give the Secretary of

10 State and the county notice of a violation of the

11 NVRA?

12     **A.  Yes.**

13     Q.  Is there any other purpose for sending

14 the letter?

15     **A.  No.**

16     Q.  I just want to clarify that there are no

17 other factors that go into determining what counties

18 you send notice to letters to other than the

19 determination of Mr. Camarota's report.  Is that

20 right?

21     **A.  Well, there are a lot of counties with**

22 **bad numbers.  I have -- I have to make a choice, and**

Page 38

1  **the number is -- the percentage number is the**

2  **starting point.**

3      Q.  How do you -- what are the other factors

4  you use to determine what counties to send notice

5  letters to?

6      **A.  I have generally decided to look at a**

7  **particular state and notice the counties within that**

8  **state that had excessively bad numbers.**

9      Q.  What other states besides Texas have you

10 focused on?

11         MR. ADAMS:  Objection to form.  Vague.

12         THE WITNESS:  Mississippi.

13 BY MR. ARNOLD:

14     Q.  How many counties did you send notice

15 letters to in Mississippi?

16     **A.  Offhand, I can't remember the precise**

17 **number but there were several.**

18     Q.  More than 10?

19     **A.  I couldn't say for sure.**

20     Q.  More than five?

21     **A.  I believe so.**

22     Q.  Are there any other states that you

Page 39

1  focused on besides Mississippi and Texas?

2         MR. ADAMS:  Objection.  Form.  Vague.

3         THE WITNESS:  We sent notice letters to

4  counties in Alabama, Kentucky, Arizona, Virginia,

5  Florida offhand.  I believe that those were all of

6  the states.

7  BY MR. ARNOLD:

8      Q.  What other factors besides focusing on a

9  state and the information provided by Mr. Camarota do

10 you use to determine what counties to send notices

11 letters no for NVRA violations?

12         MR. ADAMS:  Objection.  Asked and

13 answered.

14         THE WITNESS:  I don't know.  My decision

15 process -- I just make a decision.

16 BY MR. ARNOLD:

17     Q.  Have you ever sent notice letters to a

18 county where the majority of the registered voters

19 belong to the Republican party?

20     **A.  That is not -- party affiliation is not a**

21 **consideration that I take into account.**

22     Q.  Is the size or financial resources of the

Page 40

1  county a determination you use to take into account?

2         MR. ADAMS:  Objection.  Compound, form.

3  The question is compound.

4  BY MR. ARNOLD:

5      Q.  Do you understand the question?

6      **A.  I would prefer if you could rephrase it.**

7      Q.  Sure.  I'll break it down for you.

8         Do you take the financial resources of a

9  county into account when you are determining which

10 counties to send NVRA notice letters to?

11     **A.  Well, I don't specifically look at their**

12 **resources, but I certainly wouldn't -- I wouldn't say**

13 **that doesn't enter into it at some point.**

14     Q.  Why would you not send a notice letter to

15 a larger county or a more populous county?

16     **A.  Well, we have with Broward County.**

17 **Broward County is the second largest county in the**

18 **State of Florida.**

19     Q.  What do you look at -- when you look at

20 the financial resources of the county, what are you

21 looking at?

22     **A.  I don't really look at the financial**

Page 41

1  resources of the county.

2        MR. ADAMS: Objection. Asked and

3  answered.

4  BY MR. ARNOLD:

5    Q.  You said it wasn't -- I thought you said

6  before that it was something you took into account.

7    A.  Well, it's not really something that I

8  take into account. It's a -- I suppose it's -- I

9  don't really know what the financial considerations

10  are in the county. I don't look at their -- I don't

11  look at their books.

12    Q.  Do you take into account the ability of a

13  county to defend a lawsuit for an NVRA violation?

14        MR. ADAMS: Objection. Form, vague.

15        THE WITNESS: I'm not sure I would know

16  how to do that.

17  BY MR. ARNOLD:

18    Q.  Are you provided any advice on what

19  counties to send NVRA violation notices to?

20        MR. ADAMS: Objection. Privileged. I'm

21  going to instruct the witness not to answer.

22  BY MR. ARNOLD:

Page 42

1    Q.  Aside from your attorneys, are you

2  provided any advice on who to send NVRA violation

3  notice letters to?

4        MR. ADAMS: Objection. Privileged. I

5  instruct the witness not to answer. It's work

6  product.

7        MR. ARNOLD: Other than counsel -- what

8  is your objection?

9        MR. ADAMS: She could be getting advice

10  from attorneys working with consultants and

11  demographers and election law experts. That's all

12  part of the attorney work product in her decision

13  making. I'm going to instruct her again not to

14  answer.

15        MR. ARNOLD: If a third party knows about

16  it, then --

17        MR. ADAMS: A third party working with

18  the attorneys to make a decision is privileged.

19  She's not going to answer.

20  BY MR. ARNOLD:

21    Q.  Are there any third parties other than

22  your attorneys that you use to inform yourself which

Page 43

1  counties to send NVRA notice violation letters to?

2    A.  Yes. Mr. Camarota's report.

3    Q.  Are there any others?

4    A.  No. Not that come to mind.

5    Q.  Can you describe to me the proper process

6  a county voter registrar should follow if they

7  suspect voter fraud?

8        MR. ADAMS: Objection. Form, vague.

9  BY MR. ARNOLD:

10    Q.  If you know.

11    A.  There are a number of tools that an

12  administrator can use. They should be checking the

13  NCOA. They should be checking with the Department of

14  Motor Vehicles. They should be checking at least the

15  local obituaries. They should be conducting regular

16  mailings to see if they get return mail.

17        There are a number of tools that are

18  available to them; the Department of Motor Vehicle

19  information, as you pointed out earlier, the Social

20  Security Death Index, simply looking at obituary,

21  checking especially in smaller counties. I think

22  that's a much easier task, to observe local funeral

Page 44

1  home outreach, things of that nature. There are a

2  number of steps.

3        MR. ADAMS: I am going to object to the

4  responsiveness of the answer because she answered the

5  question you did not want to ask. Your question was

6  about voter fraud being reported. So, plaintiffs

7  object to the responsiveness of the answer.

8  BY MR. ARNOLD:

9    Q.  You just listed a series of things a

10  voter registrar could use to help them maintain their

11  voter rolls. Right?

12    A.  That's correct.

13    Q.  What is the basis for that information,

14  in your opinion?

15        MR. ADAMS: Objection. Form. Vague.

16  BY MR. ARNOLD:

17    Q.  Well, is there a report you read or a

18  book you read or an article you read that listed

19  these things, or is this just experience you've

20  acquired over the years?

21    A.  Well, the NVRA has certain requirements

22  and, I think, common sense and good management.

Page 45

1    Q.   For example, the NVRA doesn't require
2 that a county registrar read the local obituaries.
3 Where did you get that idea from?
4    **A.   Well, perhaps I'm putting myself in the**
5 **place of an administrator and the steps that I would**
6 **take.**
7    Q.   And you've never been a county
8 administrator?
9         MR. ADAMS:  Objection.  Asked and
10 answered.
11        THE WITNESS:  No, I haven't.
12 BY MR. ARNOLD:
13    Q.   So, there's no report or book or anything
14 else you've come across and read that informed your
15 opinion of the steps you listed that the county
16 registrar shall take to maintain their voter rolls?
17    **A.   Well, there are steps that we have been**
18 **advising for many years, good management tools.  I**
19 **believe that best practices are written out.  They**
20 **are available to election administrators.  There are**
21 **certain things that we just believe should be done in**
22 **order to maintain accurate rolls.**

Page 46

1    Q.   We talked earlier about John Mashburn.
2 What did he do when we worked for the ACRU?
3    **A.   He was Executive Vice President for ACRU.**
4    Q.   What specifically was his job duty?
5    **A.   He assisted me in writing, doing**
6 **research, managing staff.**
7    Q.   Was he directly underneath you in the
8 chain of command?
9    **A.   Yes.**
10    Q.   Does Mr. Mashburn currently work for the
11 ACRU?
12    **A.   No, he does not.**
13    Q.   When did he leave the ACRU?
14    **A.   I believe it was around June of 2014.**
15    Q.   And you said earlier, that Mr. Mashburn
16 traveled to Starr County on January 27, 2016.
17 Correct?
18    **A.   I believe it was the 26th, 27th, yes,**
19 **that's correct.**
20    Q.   You know the date better than I do.
21    **A.   I remember the travel receipts.**
22    Q.   And I have those.  Let's look at those,

Page 47

1 because that's where I was getting my information
2 from.  So, this may be a good time to look at them.
3         (Carleson Exhibit No. 3,
4         email from John Mashburn to Susan
5         Carleson dated February 8, 2016
6         with attached receipts, Bates
7         stamped ACRU-000072-84, was
8         marked for identification.)
9 BY MR. ARNOLD:
10    Q.   This is Exhibit 3.  And that is Bates
11 label add ACRU 72 to ACRU 84.  And that is a list --
12 an email and looks like a list of bills that Mr.
13 Mashburn sent to you after his trip to Starr County.
14 Is that right?
15    **A.   Uh-huh.  Yes.**
16    Q.   And that's what was provided to me.  I
17 didn't see any other bills Mr. Mashburn sent to you.
18 Does this look like a complete list of bills Mr.
19 Mashburn sent to you?
20    **A.   I would assume they are.  I have no**
21 **reason to not think that they are.**
22    Q.   I know it was almost two years ago.

Page 48

1    **A.   Yes.  It was quite awhile ago.**
2    Q.   I am not asking you to remember that.
3 But it looks about right?
4         MR. ADAMS:  Objection.  Asked and
5 answered.
6 BY MR. ARNOLD:
7    Q.   Does Exhibit 3 look complete to you?
8         MR. ADAMS:  Objection.  Asked and
9 answered.
10        THE WITNESS:  Yes.  I believe it does.
11 BY MR. ARNOLD:
12    Q.   What was the total?  I believe it is
13 handwritten on the first page of Exhibit 3 that Mr.
14 Mashburn incurred.
15    **A.   The total of the amount of the check that**
16 **I --**
17    Q.   I don't know.  What is handwritten?  Let
18 me just ask you that.  What is handwritten on the
19 first page of the exhibit?
20    **A.   $7,341.45.**
21    Q.   I'm sorry.
22        MR. ARNOLD:  Adam, was that you?  Can you

Page 49

1  hear me?

2        MR. BITTER:  I can hear all right, yes.

3        MR. ARNOLD:  I just heard somebody on the

4  phone.  I just wanted to make sure you all were

5  there.

6        MR. BITTER:  I'm still here, yes.

7  BY MR. ARNOLD:

8     Q.    $7,341.45.  Correct?

9     **A.    That's correct.**

10    Q.    Is that your handwriting?

11    **A.    Yes, it is.**

12    Q.    That's the check you paid to Mr. Mashburn

13  to reimburse him for his expenses for his trip to

14  Starr County?

15    **A.    That's correct.**

16    Q.    Why did Mr. Mashburn travel to Starr

17  County?

18    **A.    To meet with Mr. Montalvo to try to work**

19  **out an arrangement for them to clean up their voting**

20  **rolls so we would not have to institute litigation.**

21    Q.    Before Mr. Mashburn traveled to Starr

22  County, did he call Mr. Montalvo on the telephone or

Page 50

1  email?

2     **A.    I believe there was communication between**

3  **him and Mr. Montalvo or his assistant.**

4     Q.    And they arranged to meet on January 27?

5     **A.    Yes.**

6     Q.    Did you or anyone else at the ACRU

7  contact Starr County other than Mr. Mashburn?

8     **A.    I sent the notice letter to Starr County.**

9     Q.    That was in December 2015.  Correct?

10    **A.    That's correct.**

11    Q.    Other than that, did anyone at the ACRU

12  attempt to contact Starr County other than Mr.

13  Mashburn?

14    **A.    No.**

15    Q.    Before Mr. Mashburn went to Starr County,

16  did he or anyone at the ACRU attempt to obtain

17  documents from Starr County?

18    **A.    We had requested documents in our notice**

19  **letter, but we had not received any.**

20    Q.    Did you follow up through your notice

21  letter on a phone call or another letter saying, we

22  hadn't gotten the documents yet?

Page 51

1     **A.    I did not externally.**

2     Q.    Do you know if Mr. Mashburn did?

3     **A.    I do not.**

4     Q.    Do you know if anyone else at the ACRU

5  did?

6     **A.    No.**

7     Q.    Who did Mr. Mashburn meet when we went to

8  Starr County?

9        MR. ADAMS:  Objection.  Asked and

10  answered.

11        THE WITNESS:  Mr. Montalvo.

12  BY MR. ARNOLD:

13    Q.    Do you know if he met with anyone else?

14    **A.    I believe that Mr. Montalvo's assistant**

15  **was present as well.  I believe his name was John but**

16  **I'm not certain of that.**

17    Q.    Presumably, John Rodriguez who is the

18  current elections administrator in Starr County.  Is

19  that your understanding.

20    **A.    Oh.  Then that's who that would have**

21  **been.**

22    Q.    When Mr. Mashburn went down to Starr

Page 52

1  County, did he request any documents from

2  Mr. Montalvo?

3     **A.    I was not present, so I presume -- I**

4  **don't know what to presume.  I don't know.**

5     Q.    Let me ask you this.  What was the

6  purpose of Mr. Mashburn's visit to Starr County other

7  than to have a general conversation with

8  Mr. Montalvo?

9        MR. ADAMS:  Objection.  Asked and

10  answered and mischaracterizes her prior testimony.

11        THE WITNESS:  Mr. Mashburn went there

12  with the intent of resolving the problem.

13  BY MR. ARNOLD:

14    Q.    What was the problem?

15        MR. ADAMS:  Objection.  Asked and

16  answered.

17        THE WITNESS:  Bloated voter rolls.

18  BY MR. ARNOLD:

19    Q.    In ACRU's opinion, too many people were

20  registered to vote in Starr County.  Is that right?

21        MR. ADAMS:  Objection.  Asked and

22  answered and argumentative.

Susan Carleson

14 (53 - 56)

Page 53

BY MR. ARNOLD:

1 BY MR. ARNOLD:

2   Q.   Is that correct?

3   A.   Yes.  As I know this letter pointed out,

4 there was 109 percent of the citizen voting age

5 population registered to vote.

6   Q.   So, Mr. Mashburn's visit was a follow-up

7 to your December 2015 notice letter.  Correct?

8   A.   Yes.

9   Q.   Did he go -- did you talk with Mr.

10 Mashburn before he went to Starr County?

11   A.   Briefly.

12   Q.   What did you all discuss about his trip

13 to Starr County?

14   A.   The goal was to -- just simply the goal.

15 We didn't go into any tremendous detail about it.  He

16 knew what the goal was.

17   Q.   What was the goal?

18   A.   To try to get Mr. Montalvo to agree that

19 he would take remedial action to correct the problems

20 with the voter rolls.

21   Q.   What specific remedial actions was Mr.

22 Mashburn going to ask Mr. Montalvo to address?

Page 54

1   A.   List maintenance practices.  The problem

2 was they had bad numbers, but the numbers were so bad

3 there was obvious lacking of any list maintenance

4 activity.  The goal was to get them to acknowledge

5 that and correct the situation.

6   Q.   Did Mr. Mashburn bring any best practices

7 documentation or pamphlet with them to say, here is

8 what we think you should be doing?

9   A.   I don't know, but Mr. Mashburn was well

10 acquainted with best practices and management

11 techniques.

12   Q.   And if you know -- you may not know -- do

13 you think Mr. Mashburn's opinion of best practices

14 for list maintenance were the same ones you listed

15 earlier about obituaries and using the National

16 Change of Address database?

17   MR. ADAMS:  Objection.  That response

18 that the witness gave was objected to as

19 nonresponsive, and the question that was objected to

20 was vague.  As far as I know, you haven't asked what

21 the best practices are.  So, we're going to object to

22 that question.

Page 55

1 BY MR. ARNOLD:

2   Q.   In your opinion, what are the best

3 practices for a county to maintain their voter

4 registration rolls?

5   A.   Well, I'm not an expert in this area

6 because I've never practiced it, but they should be

7 -- well, by law, they should be doing mailings to see

8 who has moved out.  The NCOA will alert them to the

9 fact with return mail.

10   They should be checking the Social

11 Security Death Index.  They should be making efforts

12 to -- in a small county, where you know who your

13 funeral homes are, I think that enables them to have

14 a personal, a more personal relationship with those

15 and be able to get accurate information.

16   There should be cross checking with other

17 counties, with other states.  They should be checking

18 the Department of Motor Vehicles' records.  There are

19 a number of areas that should be -- jury

20 declinations.  A number of management techniques

21 exist.  A number of tools exist that are easily

22 implemented and can help ensure accurate voter rolls.

Page 56

1   (Carleson Exhibit No. 4,

2   document entitled "Best Practices

3   for Achieving Integrity in Voter

4   Registration," was

5   marked for identification.)

6   MR. ARNOLD:  I'll mark this Exhibit 4.  I

7 apologize.  I only have one copy but I'm sure

8 everybody is familiar with it.

9 BY MR. ARNOLD:

10   Q.   This is the Best Practices for Achieving

11 Integrity and Voter Registration, a report prepared

12 by the Public Interest Legal Foundation.  Have you

13 ever seen this before?

14   A.   Yes, I have.

15   Q.   And does that give an accurate summary of

16 what you think the best practices are for elections

17 and registration?

18   A.   Yes.

19   MR. ADAMS:  Objection to form.  Vague.

20 BY MR. ARNOLD:

21   Q.   I'm sorry.  What was your answer?

22   A.   Yes.  I think it is a very well presented

Page 57

1  document.

2   Q.   Do you know who wrote that document?

3   **A.   Yes.**

4   Q.   Who wrote the document?

5   **A.   The Public Interest Legal Foundation.**

6   Q.   Do you know specifically who authored it?

7   **A.   Specifically who authored it?**

8   Q.   Yes, ma'am.

9   **A.   I presume that --**

10      MR. ADAMS:  Objection.  Relevance.  It

11  has nothing to do with this case.  I mean, maybe you

12  want to argue with her about this, but this doesn't

13  have anything to do with this case.

14      MR. ARNOLD:  Your objection is relevance?

15      MR. ADAMS:  Correct.

16  BY MR. ARNOLD:

17   Q.   Do you understand the question?

18   **A.   Yes.  I don't personally know.  I assume**

19  **it was a collaborative effort.**

20   Q.   Did you participate in creating that

21  document?

22   **A.   No, I did not.**

Page 58

1   Q.   Did anyone at the ACRU participate in

2  creating that document?

3   **A.   No, we did not, no.**

4   Q.   So, when Mr. Mashburn went down to Starr

5  County to meet with Mr. Montalvo in January 2016, you

6  said earlier you don't know what documents he

7  requested, but he was trying to meet with

8  Mr. Montalvo about best practices for the county.

9  Correct?

10   **A.   Correct.**

11      MR. ADAMS:  Objection.  Asked and

12  answered.

13  BY MR. ARNOLD:

14   Q.   Do you know if he requested any documents

15  while he was in Starr County?

16   **A.   I believe he did but I was not present.**

17   Q.   So, you don't know what documents he

18  requested?

19      MR. ADAMS:  Objection.  Asked and

20  answered.

21  BY MR. ARNOLD:

22   Q.   Go ahead.

Page 59

1   **A.   Yes.  I was not present so I don't know.**

2   Q.   Did Mr. Mashburn come back with my

3  documents from his trip to Starr County?

4   **A.   No.**

5   Q.   Do you know why Mr. Mashburn did not

6  return with any documents from Starr County?

7   **A.   Mr. Montalvo said he had no intent to**

8  **cooperate with us.**

9   Q.   Did you meet with Mr. Mashburn when he

10  returned from his trip to Starr County?

11   **A.   We spoke on the phone.**

12   Q.   What did you all talk about on the phone?

13   **A.   Basically, that he made the trip.  He**

14  **wasn't getting a report.  He was no longer an**

15  **employee of us.  I had contracted with him.**

16   Q.   Do you remember what Mr. Mashburn told

17  you on the telephone about his conversations with

18  Mr. Montalvo?

19   **A.   Yes, that there was no cooperation**

20  **forthcoming.**

21   Q.   Anything specific?  Did Mr. Montalvo say,

22  "No, I'm not giving you a single document"?

Page 60

1   **A.   I don't recall the specificity.  The**

2  **bottom line was there was not going to be any**

3  **cooperation.**

4   Q.   And Mr. Mashburn prepared a report, you

5  said, about his trip to Starr County?

6   **A.   Yes.**

7   Q.   Was it a written report?

8   **A.   Yes.**

9   Q.   Do you have a copy of the written report?

10   **A.   Not with me.**

11   Q.   Does the ACRU have a copy of the written

12  report?

13   **A.   Yes.**

14   Q.   Did he email that report to you?

15   **A.   I believe so, yes.**

16   Q.   And does Mr. Mashburn live in the

17  Washington, D.C. area or does he live somewhere else?

18   **A.   He lives in D.C.**

19   Q.   Did he at the time, around January 2016,

20  live in the D.C. area?

21   **A.   Yes.**

22   Q.   Did he personally come into the ACRU

**Page 61**

1 office or meet you over coffee to discuss this trip

2 to Starr County?

3        MR. ADAMS: Objection. Asked and

4 answered. She said it was on the telephone.

5        THE WITNESS: It was on the telephone.

6 BY MR. ARNOLD:

7    Q.   There was no other contact with you and

8 Mr. Mashburn about his trip to Starr County?

9    **A.   No.**

10   Q.   Did you read Mr. Mashburn 's report?

11   **A.   Yes.**

12   Q.   What did his report say?

13   **A.   It basically said he had made inquiries**

14 **about various aspects of list maintenance activities**

15 **with Mr. Montalvo and that the responses were that**

16 **activity wasn't being -- wasn't ongoing, and that's**

17 **about it.**

18   Q.   Did you ever personally talk with

19 Mr. Montalvo?

20   **A.   Mr. Montalvo placed a telephone call to**

21 **me.**

22   Q.   Did you talk to him on the telephone?

**Page 62**

1    **A.   I did.**

2    Q.   What did you all discuss?

3    **A.   He wanted to know -- he wanted to discuss**

4 **with me about his county. I told him that someone**

5 **would be coming down to meet with him, and that was**

6 **about it. It wasn't much of a conversation.**

7    Q.   So, you did talk to Mr. Montalvo before

8 Mr. Mashburn visited Starr County. Correct?

9    **A.   Yes. He initiated a phone call to me.**

10   Q.   Other than what you just said, were there

11 any specifics you recall about the conversation with

12 Mr. Montalvo?

13   **A.   Not particularly.**

14   Q.   Was it a brief conversation?

15   **A.   Yes.**

16   Q.   Was it less than a minute?

17   **A.   I would say that it was less than three**

18 **minutes.**

19   Q.   Okay. Did Mr. Montalvo on that phone

20 call offer to send you think documents or clarify any

21 requests you may have?

22   **A.   No, he did not.**

**Page 63**

1    Q.   What did Mr. Montalvo say when he called

2 you?

3    **A.   He said that he didn't think that we were**

4 **correct in our assessment of his voter rolls.**

5    Q.   Custody he say anything else?

6    **A.   I said, well, we were basing it on**

7 **information that we had and that we would have**

8 **someone come down and visit with him.**

9    Q.   Okay. What did Mr. Montalvo respond to

10 that?

11   **A.   Nothing.**

12   Q.   That was the end of the conversation?

13   **A.   That was the end of the conversation,**

14 **correct.**

15   Q.   Was Mr. Montalvo rude or impolite on that

16 phone call?

17   **A.   No.**

18   Q.   Does the ACRU have any members in Starr

19 County?

20   **A.   I believe we have one member who lives**

21 **within the ZIP code of Starr County.**

22   Q.   Do you know who that member is?

**Page 64**

1        MR. ADAMS: Objection. Plaintiff has

2 objected to the -- withdraw the objection. Your

3 question was, do you know who that member is?

4        MR. ARNOLD: Yes.

5        MR. ADAMS: Okay.

6        THE WITNESS: No, I do not.

7 BY MR. ARNOLD:

8    Q.   Does the ACRU keep a list of its members?

9    **A.   I had no interest in knowing the name of**

10 **the member, only how many we have.**

11   Q.   Why did you not have any interest in

12 knowing the name of the member?

13   **A.   It's irrelevant to me and it's not**

14 **information that I would convey anyway.**

15   Q.   Why is that?

16   **A.   We don't divulge the names of our donors**

17 **for privacy reasons.**

18        (Carleson Exhibit No. 5,

19        email from Jorge Canales at Starr

20        County Town Crier to Stacey

21        Cornett dated December 23, 2015,

22        Bates stamped ACRU-00007071, was

Page 65

1            marked for identification.)

2            MR. ARNOLD:  This is Exhibit 5 which is

3    Bates labeled ACRU 70 and ACRU 71.

4            MR. ADAMS:  Thank you.

5    BY MR. ARNOLD:

6        Q.    Have you seen this before?

7        A.    Yes.

8        Q.    What is Exhibit 5?

9        A.    This is the ad that we took in the

10   newspaper.

11       Q.    What newspaper?

12       A.    The Starr County Town Crier.

13       Q.    And that's the ad you referenced earlier

14   that you all used to promote voter awareness in Starr

15   County.  Is that right?

16       A.    Yes.

17       Q.    Do you know what the ad looked like?

18       A.    Yes, I do.

19       Q.    What did the ad say?

20       A.    "Are The Dead Voting In Starr County?"

21       Q.    Could you describe the ad?

22       A.    To the best of my recollection, it had a

Page 66

1    -- it was a graphic depicting a tombstone with an "I

2    voted" sticker on it and then the question:  "Are The

3    Dead Voting In Starr County?"

4        Q.    When did that ad run in the Starr County

5    Town Crier?

6        A.    Well, this is dated December 23.

7        Q.    Of what year?

8        A.    I'm sorry.  2015.

9        Q.    So, before Mr. Mashburn visited Starr

10   County.  Is that right?

11       A.    Yes.

12       Q.    What was the date of your notice letter

13   to Starr County?

14       A.    December 23.

15       Q.    So, did the ad run at the same time you

16   sent the notice letter to Starr County?

17       A.    Apparently so, yes.

18       Q.    Do you remember what day the ad was

19   published in the Starr County Town Crier?

20       A.    I don't.  It ran January 6, according to

21   this.

22       Q.    But you requested the ad on December 23,

Page 67

1    2015.  Correct?

2        A.    Yes.

3        Q.    Who is the person -- I see you are copied

4    on the email.  Who is the person who actually emailed

5    Starr County Town Crier?

6        A.    That was an assistant with one of our

7    vendors.

8        Q.    Not an ACRU employee?

9        A.    No.

10       Q.    Do you have the records of this ad and

11   did you get a copy of the ad, that copy and bills for

12   it?

13       A.    I'm sure I have it, yes.

14       Q.    Other than this ad, was there any other

15   expense ACRU incurred prior to sending down Mr.

16   Mashburn to Starr County?

17       A.    I do not believe so, specifically, no.

18       Q.    After Mr. Mashburn visited Starr County

19   and other than this lawsuit, did the ACRU incur any

20   expenses in Starr County?

21       A.    Could you --

22            MR. ADAMS:  Objection.  Asked and

Page 68

1    answered.

2    BY MR. ARNOLD:

3        Q.    Let me rephrase it.  I think you

4    testified earlier, I just want to confirm it, that

5    this ad that's Exhibit 5 and Mr. Mashburn's expenses

6    are the only two expenses the ACRU incurred before

7    filing this lawsuit.  Is that right?

8            MR. ADAMS:  Objection.  Asked and

9    answered.

10           THE WITNESS:  Well, there would have been

11   -- yes.  That's it.  That's it.

12   BY MR. ARNOLD:

13       Q.    Okay.  Did the ACRU put any projects on

14   hold because of the money it spent in Starr County

15   sending Mr. Mashburn down there and running the ad in

16   Starr County?

17       A.    On hold?

18       Q.    Yes, ma'am.

19           MR. ADAMS:  Objection to form.  Vague.

20           THE WITNESS:  I can't -- I don't really

21   know how to answer that.  I presume -- I don't

22   believe there was anything that we didn't do.  We may

Page 69

1  have -- we may have had a restricted budget from one
2  of our projects as a results because it was quite a
3  bit of money that we expended, but I don't believe we
4  put anything on hold.
5  BY MR. ARNOLD:
6      Q.   How did the ACRU get its name?
7      **A.   My husband chose it.**
8      Q.   Do you know why he chose the American
9  Civil Rights Union?
10     **A.   Yes.**
11     Q.   Why did he choose the American Civil
12 Rights Union?
13     **A.   Because he wanted us to be the answer to**
14 **the American Civil Liberties Union.**
15     Q.   I figured it was a play on ACLU but I
16 just wasn't sure.
17         What did your husband do before he
18 started ACRU?
19     **A.   My husband --**
20         MR. ADAMS:  Objection.  Relevance.  This
21 is a 30(b)(6) deposition.
22         THE WITNESS:  My husband had a long

Page 70

1  career with Ronald Reagan as Governor and President,
2  and as a professional city manager.
3  BY MR. ARNOLD:
4      Q.   Before you sent your notice letter in
5  December of 2015 to Starr County, did the ACRU have
6  any contact with the Starr County Elections Office?
7      **A.   No.**
8      Q.   If the ACRU wins this case, what is the
9  ACRU's hope that the judge will issue an order,
10 ordering Starr County to perform certain acts?
11         MR. ADAMS:  Objection; speculation, form,
12 vague.
13 BY MR. ARNOLD:
14     Q.   Do you have a goal if you win this
15 lawsuit, what would you want the judge to do?
16     **A.   I have a goal that the voter rolls would**
17 **be cleaned up.**
18     Q.   Do you have any specific idea of what the
19 American Civil Rights Union will request the judge to
20 order the county to do?
21         MR. ADAMS:  Objection.  Speculation.
22 Privileged.

Page 71

1         THE WITNESS:  I suspect that is a
2  decision that our attorneys are going to make based
3  on other consent decrees that we have received.
4  BY MR. ARNOLD:
5      Q.   So, the ACRU's goal is more global.  You
6  are not looking for any specific action?
7         MR. ADAMS:  Objection to form, vague; and
8  asked and answered.
9         THE WITNESS:  Yes.  We want clean voter
10 rolls.
11 BY MR. ARNOLD:
12     Q.   As far as -- for example, your best
13 practice that you listed, would you like the judge to
14 order the Starr County elections administrator to
15 read the obituaries weekly?
16     **A.   I would like for them to do everything**
17 **that's necessary to maintain accurate voter rolls,**
18 **because the citizen residents of the county deserve**
19 **it.**
20     Q.   I just want to explore that with you.
21 What do you think is necessary?  Everything we talked
22 about earlier as best practices or is there anything

Page 72

1  else?
2      **A.   Yes.  I would like it all.**
3      Q.   So, the best practices we talked about
4  earlier, is that one of them?
5      **A.   Uh-huh.**
6      Q.   Is there anything else you think Starr
7  County needs to do besides implementing the best
8  practices we discussed?
9         MR. ADAMS:  Objection.  Asked and
10 answered.
11        THE WITNESS:  I'm not sure what the
12 question is.  We want them to clean up their voter
13 registration rolls.  That's what our lawsuit is
14 about.
15 BY MR. ARNOLD:
16     Q.   Really what I'm getting at here is kind
17 of more specifically, if the ACRU -- and you may not.
18 I don't know.  But do you have a goal of what -- the
19 judge is going to issue an order in this case saying
20 something, maybe dismissing the lawsuit, maybe ruling
21 in favor of the county, maybe ruling in favor of the
22 Secretary of State, maybe ruling in favor of the

Page 73

1 ACRU.

2      If the judge rules in favor of the ACRU,

3 what do you want the judge or the county or the state

4 to do?

5      MR. ADAMS:  Objection.  This is

6 speculative, premature.  It calls for a legal

7 conclusion by the witness and it's been asked and

8 answered.

9 BY MR. ARNOLD:

10    Q.   Do you understand the question?

11      MR. ADAMS:  It wasn't a vagueness

12 objection.

13      THE WITNESS:  We want the voter rolls

14 cleaned up and we want a signal sent to other

15 counties that they need to clean up their rolls.

16 That's our goal.  That's what we're after.

17 BY MR. ARNOLD:

18    Q.   I get that as a global goal, but are

19 there any specific things you want the judge to say

20 because the judge issuing an order saying clean up

21 your voter rolls is a little vague.  Is there

22 anything you want the judge to say specifically?

Page 74

1      MR. ADAMS:  Objection.  That's

2 argumentative.  That's now the fifth time you asked

3 that question.  This is my fifth asked and answered.

4      MR. ARNOLD:  She hasn't answered the

5 question.

6      MR. ADAMS:  She's answered it four, five

7 times different ways.  You've asked for her to tell

8 you what she will ask for in a remedial stage.

9 That's what you're asking.  Nobody knows this.

10      She's answered this a number of times

11 with specifics about reading the obituaries.  She has

12 gone over a laundry list of things.  She's given you

13 general answers.  And this is the fifth asked and

14 answered objection on this question.

15 BY MR. ARNOLD:

16    Q.   Is the answer to the question you don't

17 have anything specific in mind you will ask the judge

18 in this case?

19      MR. ADAMS:  Objection.  Asked and

20 answered, and that's mischaracterizing the testimony.

21      THE WITNESS:  I would like the judge to

22 order Starr County to do everything reasonable that

Page 75

1 they can to get the voter rolls cleaned up and to

2 maintain them going forward.

3 BY MR. ARNOLD:

4    Q.   Do you have any opinions about John

5 Rodriguez, the current elections administrator in

6 Starr County?

7      MR. ADAMS:  Objection; form, vague.

8      THE WITNESS:  Any opinions?

9 BY MR. ARNOLD:

10    Q.   Yes, ma'am.

11    **A.   I've not met the gentleman.  I have no**

12 **real opinion.**

13    Q.   Have you read Mr. Rodriguez's deposition

14 in this case?

15    **A.   Yes, I have.**

16    Q.   Did you form any opinions from that

17 deposition?

18    **A.   It appears that he has -- he is not**

19 **taking care of his voter rolls and that there is a**

20 **lack of list maintenance practices that frankly are**

21 **appalling.**

22    Q.   Do you have any other opinions based on

Page 76

1 that?

2    **A.   No.**

3    Q.   Did you have any opinions of Mr. Montalvo

4 before he passed away?

5    **A.   No.**

6    Q.   Was the only contact you had with

7 Mr. Montalvo the one where Mr. Montalvo called you?

8      MR. ADAMS:  Objection.  Asked and

9 answered.

10      THE WITNESS:  That's correct.

11 BY MR. ARNOLD:

12    Q.   Do you think that the Texas Secretary of

13 State has established a reasonable system to remove

14 voters from Texas voter rolls?

15    **A.   I don't have a basis for -- to make --**

16 **have an opinion on that.**

17    Q.   So, no opinion whether or not --

18      MR. ADAMS:  Objection.  Asked and

19 answered.

20      THE WITNESS:  I really have no opinion on

21 that.

22 BY MR. ARNOLD:

Page 77

1    Q.    What is your understanding of the

2    State -- the Texas Secretary of State system they

3    implement to maintain voter rolls in Texas?

4        **A.    I understand there is something called**

5    **TEAM, Texas Election Administrative System (sic), I**

6    **believe, that provides information to counties.**

7        Q.    Okay.  Do you know any other details

8    other than that?

9        **A.    No.**

10       Q.    Have you looked at the Texas

11   administrator as it relates to the Secretary of

12   State's rules regarding elections in Texas?

13       **A.    Well, there are certain rules that are**

14   **there that Starr County was not following.**

15       Q.    So, you have read the Texas

16   Administrative Code about elections law, the

17   elections rules?

18       **A.    Not the entire code.**

19       Q.    The code that encompasses many branches

20   of state government, but have you read the ones that

21   pertain to Texas elections law?

22       **A.    I have some familiarity.**

Page 78

1        MR. ADAMS:  Objection.  Asked and

2    answered.

3        MR. ARNOLD:  I think she's adding to her

4    answer.

5        THE WITNESS:  I have certain familiarity.

6    BY MR. ARNOLD:

7        Q.    Do you think the Secretary of State's

8    Administrative Code is inadequate to run a reasonable

9    system for the State of Texas?

10       **A.    I have no opinion.**

11       Q.    Do you think the Secretary of State, the

12   TEAM system you described earlier, is adequate to run

13   a reasonable system in Texas?

14       **A.    I have no opinion.**

15       Q.    Do you think the Texas Secretary of State

16   is doing a good job implementing it system that's

17   required under the NVRA?

18       **A.    I really have no opinion.**

19       Q.    How many counties has the ACRU initiated

20   litigation against NVRA Section 8 violations?

21       **A.    I think it's -- let's see.  Eight.**

22       Q.    Eight?

Page 79

1        **A.    Eight.**

2        Q.    Okay.  We have Starr County is one,

3    Zavala County is two, there was a county in

4    Mississippi.  Correct?

5        **A.    Walthall County in Mississippi, Jefferson**

6    **Davis County in Mississippi, Clark County,**

7    **Mississippi, and Nexubee County, Mississippi.**

8        Q.    Then there was Broward County, Florida?

9        **A.    Correct.**

10       Q.    And what is the eighth one?

11       **A.    Starr.**

12       Q.    I thought I already had Starr in there.

13       MR. ADAMS:  We will stipulate it's the

14   City of Philadelphia.

15       THE WITNESS:  I'm sorry.  I forgot

16   Philadelphia.

17   BY MR. ARNOLD:

18       Q.    Would that make it nine?  Did we list

19   them all?

20       **A.    I believe so.  I believe they are all**

21   **listed, yes.**

22       Q.    How many lawsuits is the NVRA currently

Page 80

1    engaged in?

2        MR. ADAMS:  Objection; form, vague.

3    BY MR. ARNOLD:

4        Q.    How many lawsuits is the ACRU currently

5    engaged in?

6        **A.    We are currently engaged in Starr County**

7    **and Broward County.**

8        Q.    Has the judge in the Broward County case

9    issued an opinion that you're aware of?

10       MR. ADAMS:  Objection.  Relevance.

11   BY MR. ARNOLD:

12       Q.    That you're aware of?

13       **A.    Not a final ruling.**

14       MR. ARNOLD:  Do you want to take a break?

15       MR. ADAMS:  Sure.

16       (Recess taken.)

17           (Carleson Exhibit No. 6, printout

18           from ACRU web site entitled

19           "Mission Statement," was

20           marked for identification.)

21   BY MR. ARNOLD:

22       Q.    Ms. Carleson, I marked this as Exhibit 6

Page 81

1 and we talked about it a little earlier. I just

2 printed this off your web site. This is -- it didn't

3 print very well, I tell you, but a Mission Statement.

4 It was the tab it was under on the ACRU web site.

5    Is that Mission Statement inclusive of

6 the activities the ACRU was promoting?

7    **A. Yes.**

8    MR. ARNOLD: I don't have any other

9 questions. I'll pass the witness.

10    MR. ADAMS: What about --

11    MR. ARNOLD: Adam, do you have any

12 questions?

13    MR. BITTER: No. I do not have any

14 questions. Just for the record, the Defendant Pablos

15 did not serve a notice for the 30(b)(6) deposition

16 today. We don't have any designated topics at this

17 time. We obviously reserve the right to do a

18 30(b)(6) down the road but at this time, we do not

19 have any questions. Thank you.

20    EXAMINATION

21 BY MR. ADAMS:

22    Q. Mrs. Carleson, as I understand your

Page 82

1 testimony, you've read Mr. Palmer's expert report in

2 this case?

3    **A. Yes, I have.**

4    Q. Do you agree with his conclusions?

5    **A. Yes, I do.**

6    Q. Do you agree about the number of matters

7 he recommended that the defendant implement as a list

8 maintenance procedure?

9    **A. Yes, I do.**

10    MR. ADAMS: I have nothing else.

11    MR. ARNOLD: I have no questions. I

12 guess, Adam, it's back to you.

13    MR. BITTER: I have none.

14    MR. ARNOLD: We will go off the record.

15    (WHEREUPON, at 10:45 a.m. the deposition

16 of SUSAN CARLESON concluded.)

17

18

19

20

21

22

Page 83

1    ACKNOWLEDGMENT OF DEPONENT

2    I, _____, do

3 hereby certify that I have read the foregoing pages

4 ____ to ____ and that the same is a correct

5 transcription of the answers given by me to the

6 questions therein propounded, except for the

7 corrections or changes in form or substance, if any,

8 noted in the attached Errata Sheet.

9

10 _____    _____

11 DATE    SIGNATURE

12

13    Subscribed and sworn to before

14 me this

15 _____ day of _____ 2018.

16

17    My commission expires:

18    _____

19    _____

20    Notary Public

21

22

Page 84

1    CERTIFICATE OF NOTARY PUBLIC

2    I, Carol J. Robinson, RPR the officer

3 before whom the foregoing cause was taken, do hereby

4 certify that the witness whose testimony appears in

5 the foregoing transcript was taken by me in shorthand

6 at the time mentioned in the caption hereof and

7 thereafter transcribed by me; that said transcript is

8 a record of the testimony given by said witness to

9 the best of my ability; that I am neither counsel

10 for, related to, nor employed by any parties to the

11 action; and further, that I am not a relative or

12 employee of any counsel or attorney employed by the

13 parties hereto, nor financially or otherwise

14 interested in the outcome of this action.

15

16    CAROL J. ROBINSON

17    Notary Public in and for the

18    District of Columbia

19

20 My commission expires:

21 March 1, 2020

22

TAB B

**From:** STARR COUNTY TOWN CRIER <sctc78582@aol.com>
**Date:** Wednesday, December 23, 2015 at 10:51 AM
**To:** Stacey Cornett <stacey.cornett@cliston.com>, <susan.carleson@theacru.org>
**Subject:** Re: Ad Space Reservation

Hi Stacey,

I saved the space.

1/2 page B/W - $457.80

run date 1-6-16

Thank You
Jorge Canales

Starr County Town Crier, LLC
PO Box 209
Rio Grande City, Texas 78582

Office 956-487-6544
Fax 956-487-6165
www.starrcountytowncrier.com

APPROVAL OF FINAL ARTWORK
Starr County Town Crier takes all care to avoid errors, Starr County Town Crier accepts no responsibility
for typographical errors, spelling mistakes, or incorrect information on any project. The Client is to proof read and
approve all final ad copy.
*** Any images sent for sample are NOT for digital or printed use. They are PROOFS. Distributing, sharing, reproducing, is NOT allowed.***

——Original Message——
From: Stacey Cornett <stacey.cornett@cliston.com>
To: sctc78582 <sctc78582@aol.com>; Susan Carleson <susan.carleson@theacru.org>
Sent: Wed, Dec 23, 2015 10:04 am
Subject: Ad Space Reservation

Hi Jorge,

Our client (The American Civil Rights Union) would like to reserve ad space for a 1/2 page 6X10 (B/W)
running Wednesday, January 6. I've copied Susan Carleson, of the ACRU, on this email so she can set up an account with you and
handle billing directly.

Please let me know if you have any questions.

1

ACRU - 000070

Thanks, Stacey

Stacey Cornett |  C. Liston Communications, Inc.
877-559-1969  |  stacey.cornett@cliston.com
*View samples of our work at www.cliston.com or facebook.com/cliston*

ACRU - 000071

**Susan Carleson**

| | |
|---|---|
| **From:** | John Mashburn [Non-   ]@comcast.net> |
| **Sent:** | Monday, February 8, 2016 5:04 PM |
| **To:** | Susan Carleson |
| **Subject:** | Expenses and Billing for Starr County |
| **Attachments:** | ACRU Starr County Billed Hours - Travel Expenses for Feb-2016.docx; Plane-Car-Hotel Package Receipt.pdf; Hotel Charges Starr-Parking-Meal.pdf; Gas-Meal Receipt.pdf; Direct Computer Printing Charge to Visa.pdf; Uber to Airport.pdf; Uber from Airport.pdf |

Susan — first doc is a summary of everything. Other docs are the receipts for everything on the summary.  This place is really hard to get to!!

Cost of travel time (flight/car travel time) alone *after discount item*s = 20 hours, or  $3,500 – *which is why I had suggested a retainer amount.*

Billable time for actual work (separate from travel time) *after discount items* = 12.25 hours and is $2,143.75.

Travel expenses were  $1,697.70. This could not have been reduced —– I used Hotwire to get cheapest rates for flights, hotel, and car – significantly cheaper than flights, hotel, or car direct from providers, or via Orbtiz or Expedia which I checked against.

(Of course, I did not charge for the 18 hours of being on hold on Thursday Friday, Sat. and Sunday in order to first check the flight status and then cancel and get refunds for the first reservation for the flights, hotel and car — after the first flight got cancelled due to the Jonas Snow Storm.)

1

ACRU - 000072



Account: L45 VISA SMART R Current Time: 02/08/16 11:18:05 AM    Current Balance Non-Resp

| Date ▽ | Ref/Check No | Description | Debit | Credit | |
|--------|--------------|-------------|-------|--------|---|
| 02/08/2016 | | Non-Responsive, Irrelevant, and Personal Information | | | |
| 02/08/2016 | | | | | |
| 02/04/2016 | | | | | |
| 02/03/2016 | | | | | |
| 02/02/2016 | | | | | |
| 02/02/2016 | | | | | |
| 02/01/2016 | | | | | |
| 02/01/2016 | | | | | |
| 02/01/2016 | · ✓ | Credit Card Ln Adv OMNI CORPUS CHRISTI CORPUS CHRIST US Date 01/28/16 602921000212 3592    Printing / Parking / Meal · | -$113.20 | 76.50 | |
| 02/01/2016 | ✓ | Credit Card Ln Adv JOECRBSHK-CRP LIGHTHSE CORPUS CHRIST US Date 01/28/16 602928200888 5812    Meal | -$10.71 | | |
| 02/01/2016 | ✓ | Credit Card Ln Adv PCC 9886 CORPUS CHRIST US Date 01/28/16 602921120004 5542  Gas | -$14.15 | | |
| 02/01/2016 | ✓ | Credit Card Ln Adv PCC 7124 CORPUS CHRIST US Date 01/28/16 602928120003 5542  Gas | -$8.65 | | |
| 01/29/2016 | ✓ | Credit Card Ln Adv HOTEL COMPUTING USD VANCOUVER US Date 01/28/16 602825083307 7399    Not Hotel — Billed Separate    Computer use to Print | -$10.03 | – Billed Direct to credit card | |
| 01/29/2016 | ✓ | Credit Card Ln Adv STRIPES 2292 RIO GRANDE CY US Date 01/27/16 602821120004 5542 Gas | -$13.30 | | |
| 01/28/2016 | | Non-Responsive, Irrelevant, and Personal Information | | | |
| 01/27/2016 | ✓ | Credit Card Ln Adv AMERICAN AI 0010623725330 DALLAS US Date 01/25/16 602622870264 3001    Seat Upgrade - R | -$47.89 | | |
| 01/26/2016 | | Non-Responsive, Irrelevant, and Personal Information | | | |
| 01/26/2016 | | | | | |
| 01/25/2016 | | | | | |
| 01/25/2016 | | | | | |
| 01/25/2016 | | | | | |
| 01/25/2016 | | Credit Card Ln Adv AMERICAN AI 0010623538716 DALLAS US Date 01/21/16 602223870225 3001    Seat Upgrade | -$58.00 | | |

ACRU - 000073

Account Transactions: United States Senate

| 01/25/2016 | Credit Card Ln Adv AMERICAN AI 0010623538715 DALLAS US Date 01/21/16 602225870225 3001    Seat Upgrade | -$61.78 |
| 01/25/2016 | Credit Card Ln Adv 12655059054 877-903-0071 US Date 01/23/16 602327000520 4722    Airline pkg. | -$1,443.69 |
| 01/25/2016 | Non-Responsive, Irrelevant, and Personal Information | |
| **Totals:** | Non-Responsive, Irrelevant, and Personal Information | |

ACRU - 000074

```
Welcom.
Stripes
595 S.P.I.d
Corpus Christi, T. 84.E
(361) 289-11h
TP4857445uHOl
STRIPES 7124

                TX

Description          Qt;
-------------        ---
UNLD CR #05       6.2966
  SELF @ 1.599/ G

          Subtotal      1t 07
              Tax         0 03
  TOTAL   DEBIT   P   \4t.07
                            10.07

MC DEBIT
Payment from
Primary Account
XXXXXXXXXX5068
Auth #: 462439
Resp Code: 0
Stan: 0613290895
Invoice #: 489821
SITE ID: TP4857445001

        Diesel Fuel Contains
        Up To 20% Biodiesel Or
        Renewable State Diesel
        Tax $ 0.19 Per Gallon
ST# 7124  TILL XXXX DR# O TRAN# 5G53107
CSH: 0               01/28/16 15:55:27

ACRU - 000075
```

```
        WELCOME
     Stripes 9986
   6101 Ocean Drive
   Corpus Christi, TX
     (361) 991-2047

DATE 01/28/16    11:22
TRAN# 903014
PUMP# 03
SERVICE LEVEL: SELF
PRODUCT: UNLD
GALLONS:          8.849
PRICE/G:          1.599
FUEL SALE $$$    $14.15
       CREDIT

VISA
XXXXXXXXXXXXX1047
Auth #: 160724
Resp Code:
Stan: 060019771b
Invoice #: 280166
SITE ID: TP4857445590

Diesel Fuel Contains
Up To 20% Biodiesel
or Renewable Diesel
State Diesel Tax
0.19 per Gallon Incl
```

```
      Welcome To
     Stripes 2292
      401FM 3167
   Rio Grande City Tx.
   956-488-8619

      Stripes 2292
            TX

DATE 01/27/16    15:21
TRAN# 905781b
PUMP# 05
SERVICE LEVEL: SELF
PRODUCT: UNLD
GALLONS:          8.531
PRICE/G:          1.559
FUEL SALE $$$    $13.30
       CREDIT

VISA
XXXXXXXXXXXX1047
Auth #: 008531
Resp Code:
Stan: 0051862618
Invoice #: 248388
SITE ID: TP4859208660

Diesel Fuel Contains
Up To 20% Biolesel
or Renewable Diesel
State Diesel Tax
0.19 per Gallon Incl
```

```
Joe's Crab Shack
444 N Shoreline Blvd
  (361) 904-0227

Server: ANN              DOB: 01/28/2016
03:21 PM                      01/28/2016
Table 232/1                    10/100022

              SALE

Visa
Card XXXXXXXXXXX1047
Magnetic card present: WASHBURN JOHN K
Card Entry Method: S

Approval: 352698

        Amount:  $10.71

        + Gratuity: _____

     = Balance Due: _____

I agree to pay the above
total amount according to the
  card issuer agreement.

X_____

      -$2 TWOSDAYS-
$2 Hurricanes, Drafts & Bites
  -SUGGESTED GRATUITY-
   15% Tip=  1.48
   18% Tip=  1.78
   20% Tip=  1.98

      Joe sez Thanks!
```

# OMNI ⚜ HOTELS & RESORTS

Corpus Christi I Texas

900 North Shoreline Blvd.
Corpus Christi, TX 78401
Phone: 361-887-1600 • Fax: 361-887-6715
Reservations: 800-843-6664

MASHBURN, JOHN R.
622246115

Room Number: 957
**Daily Rate:**
**Room Type:** PDDS
**No. of Guests:** 1 / 0

| ARRIVAL | DEPARTURE | CREDIT CARD | RATE PLAN | CATEGORY | ACCOUNT |
|---------|-----------|-------------|-----------|----------|---------|
| 1/26/2016 | 1/28/2016 | XXXXXXXXXXXX1047 | EXPPO7 | NENOPP | 14501900235 |

| DATE | ROOM NO. | DESCRIPTION | REFERENCE | | AMOUNT |
|------|----------|-------------|-----------|---|--------|
| 1/26/2016 | 957 | GARAGE PARKING | SELF PARKING | | $10.00 |
| 1/22/2016 | 957 | REPUBLIC OF TEXAS | 957/2052/20.25/REPUBLIC OF TEXAS - dinner | | $46.55 |
| | | Non-Responsive, Irrelevant, and Personal Information | | | |
| 1/27/2016 | 957 | GARAGE PARKING | SELF PARKING | | $10.00 |
| 1/28/2016 | 957 | VISA | VISA | | ($113.28) |
| 1/28/2016 | 957 | VISA | VISA...1047 - CREDIT | | $9.95 |

$ 76.50

**CREDIT DUE:**        ($0.00)

TERMS:   DUE AND PAYABLE UPON PRESENTATION.  I AGREE THAT MY LIABILITY FOR THIS
BILL IS NOT WAIVED AND AGREE TO BE HELD PERSONALLY LIABLE IN THE EVENT THAT THE
INDICATED PERSON, COMPANY OR ASSOCIATION FAILS TO PAY FOR ANY PART OR THE FULL
AMOUNT OF THESE CHARGES.

Monday, February 8, 2016 at 10:58:45 AM Eastern Standard Time

**Subject:** Hotwire Vacations travel confirmation - Corpus Christi, TX - Jan 26, 2016 - (Itin# 12655059054)
**Date:** Saturday, January 23, 2016 at 5:44:00 PM Eastern Standard Time
**From:** vacation_support@hotwire.com <vacation_support@hotwire.com>
**To:** Non- ▓▓▓▓ @comcast.net Non- ▓▓▓▓ @comcast.net>

## Travel Confirmation

Thank you for booking your trip with Hotwire Vacations. View this itinerary online for the most up-to-date information.

**Need an activity or service in Corpus Christi? Here are some options we've found for you.**
• Activities & Services - Sightseeing  Dining options  Ground    🔲 Search for more Activities & Services
transportation  Attraction passes

## Booked items

---

**Your trip:** Washington to Corpus Christi

Use the airline confirmation code for check-in with the airline. Your hotel and car reservations are confirmed.

Hotwire Vacations itinerary number: **12655059054**    **Main contact:** John Kinney Mashburn
Car confirmation number: G8240552658                **E-mail** Non- ▓▓▓ @comcast.net
                                                     **Home phone:** Non- ▓▓▓▓

### Traveler and cost summary

| John Mashburn | Adult | American Airlines # Non- | $1,291.70 |
|---|---|---|---|
| | | Flight taxes/fees, Taxes & Fees | $151.99 |
| | | Total amount charged | **$1,443.69** |
| | | + Deposit: USD 50 per night + Pet deposit: USD 50.00 per stay | Collected by hotel |

🔲 View payment history.

---

### Flight summary

#### Tue 26-Jan-16

| **Washington** (DCA) | to | **Dallas** (DFW) | 1,177 mi | **American Airlines** |
|---|---|---|---|---|
| Depart 12:07 pm | | Arrive 2:37 pm | (1,894 km) | Flight: **141** |
| Terminal C | | | Duration: 3hr 30min | |

Economy/Coach Class (Seat assignments upon check-in), Food For Purchase, Boeing 737-800, 60% on time

| **Dallas** (DFW) | to | **Corpus Christi** (CRP) | 355 mi | **American Airlines** |
|---|---|---|---|---|
| Depart 3:45 pm | | Arrive 5:03 pm | (571 km) | Flight: **5726** |
| Terminal B | | | Duration: 1hr 18min | Operated by: MESA AIRLINES AS AMERICAN EAGLE |

Economy/Coach Class (Seat assignments upon check-in), CR9, 80% on time

| Total distance: 1,532 mi (2,466 km) | | | Total duration: 4hr 48mn (5hr 56mn with connections) |
|---|---|---|---|

#### Thu 28-Jan-16

| **Corpus Christi** (CRP) | to | **Dallas** (DFW) | 355 mi | **American Airlines** |
|---|---|---|---|---|
| Depart 5:39 pm | | Arrive 7:05 pm | (571 km) | Flight: **5726** |
| | | Terminal B | Duration: 1hr 26min | Operated by: MESA AIRLINES AS AMERICAN EAGLE |

Economy/Coach Class (Seat assignments upon check-in), CR9, 80% on time

| **Dallas** (DFW) | to | **Washington** (DCA) | 1,177 mi | **American Airlines** |
|---|---|---|---|---|
| Depart 7:55 pm | | Arrive 11:38 pm | (1,894 km) | Flight: **2293** |

|  | Terminal C | Duration: 2hr 43mn |
| --- | --- | --- |

**Economy/Coach Class (Seat assignments upon check-in),** Food For Purchase, Boeing 737-800, 60% on time

| Total distance: 1,532 mi (2,466 km) | Total duration: 4hr 9mn (4hr 59mn with connections) |
| --- | --- |

## Hotel summary

### Tue Jan-26-2016 (2 nights)

### Omni Corpus Christi Hotel

900 North Shoreline Blvd.          **Check in:**  Tue Jan-26-2016
Corpus Christi, TX 78401           **Check out:** Thu Jan-28-2016
United States of America

**Reservation questions:** 1-866-394-2015 for Vacation Packages support, 1-866-345-4007 for Activities support, or 001-817-983-0659 for international calls
**For other information contact the hotel:** Tel: 1 (361) 887-1600    Fax: 1 (361) 887-6715

**Hotel Class:** ☆☆☆☆☆  More lodging info
**Mandatory Hotel-Imposed fees:**
The following mandatory hotel-imposed fees are charged and collected by the hotel either at check-in or check-out.
   ▪ Deposit: USD 50 per night
   ▪ Pet deposit: USD 50.00 per stay

The above list may not be comprehensive. Mandatory hotel-imposed fees may not include tax and are subject to change.

| Contact: **John Mashburn** | 1 adult / senior |
| --- | --- |

Room description: Signature Room, 1 King Bed
Nonsmoking/Smoking: Non-Smoking
Room type: 1 KING BED

Unless specified otherwise, rates are quoted in US dollars.

**The price you selected DOES NOT include any applicable service fees, charges for optional incidentals (such as minibar snacks or telephone calls) or regulatory surcharges. The lodging facility will assess these fees, charges and surcharges upon check-out.**

## Car rental summary

### Tue Jan-26-2016

**Hertz Full Size Car:** Air conditioning, automatic transmission, unlimited mileage.

**Pick up:**                          **Drop off:**
Tue 1/26/2016 5:00 pm                 Thu 1/28/2016 5:00 pm

**Location:** counter and car in terminal, Corpus Christi, TX (CRP)
**Hours of operation:** 1/26/2016: 7:30 am - 11:30 pm 1/28/2016: 7:30 am - 11:30 pm

Car confirmation number:  G8240552658
IT number:  ITEXPD
ACRISS:  FCAR0

**Note: If you are under 25 or over 65 you may not be able to rent this car.** More rental info

## Rules and restrictions

### Package Overview

- By purchasing this package, you agree to the full rules and regulations.
- Hotwire Vacations packages can be canceled according to the cancellation rules of the individual

components making up the packages (see below for the specific rules of the components of your packages).

- You may cancel the hotel. However, cancelling the hotel will void the package.
- You may cancel your rental car(s) without affecting your other travel items.
- You may change or cancel your flight. However, cancelling the flight will void the package.
- You must call 1-866-394-2015 for Vacation Packages support, 1-866-345-4007 for Activities support, or 001-817-983-0659 for international calls to change or cancel your package.

**Flight Rules and Restrictions**

- Changes or cancellations may result in an airline fee, plus an increase in ticket price. Please refer to the airline rules.

**Hotel Rules and Restrictions**

**Corpus Christi:** Omni Corpus Christi Hotel

**Property policies**

- You must be at least 21 to check in to this hotel.
- Base rate is for 1 guest.

  **Guest charges and room capacity**
  - Total maximum number of guests per room/unit is 3.
  - Maximum number of adults per room/unit is 3.
  - Maximum number of children per room/unit is 2.
  - Maximum number of infants per room/unit is 3.
  - This property considers guests aged 20 and under, at time of travel, to be children.
  - Availability of accommodation in the same property for extra guests is not guaranteed.
  - The fee for extra adults is $10.00 per person.

- Your credit card is charged the total cost above at time of purchase. Prices and room availability are not guaranteed until full payment is received.

  **Pricing and payment**
  - Some hotels request that we wait to submit guest names until 7 days prior to check in. In such a case, your hotel room is reserved, but your name is not yet on file with the hotel.
  - Rooms are provided by Expedia Travel.

- Any changes to or cancellation of your reservation may result in fees up to the total amount paid for the reservation.

  **Cancellations and changes**
  - Prices and hotel availability are not guaranteed until full payment is received.
  - If you would like to book multiple rooms, you must use a different name for each room. Otherwise, the duplicate reservation will be canceled by the hotel.
  - There is no charge for cancellations and changes made before 11:59 AM (Central Standard Time (US & Canada)) on January 25, 2016.
  - Cancellations or changes made after 11:59 AM (Central Standard Time (US & Canada)) on January 25, 2016 are subject to a hotel fee equal to the first night's rate plus taxes and fees.
  - Cancellations or changes made after check-in on January 26, 2016 are subject to a hotel fee equal to 100% of the total amount paid for the reservation.

**Car Rules and Restrictions**

**Corpus Christi (CRP):** Hertz

- In some cases no refunds will be given for early drop off, check car vendor rules.
- Charges for additional or young drivers may apply at the time of rental.
- Any changes to or cancellation of your reservation may result in fees from $25.00 up to the full cost of your rental.
- A valid credit card in the driver's name may be required.
- Taxes and surcharges are included.
- Charges for optional services, fuel, insurance waivers, etc. are not included.
- The minimum rental age for all drivers is 25 years.
- Renter must have a valid driver's license.

**Mandatory Hotel-Imposed fees**

The following mandatory hotel-imposed fees are charged and collected by the hotel either at check-in or check-out.

**Hotel:** Omni Corpus Christi Hotel

- Deposit: USD 50 per night
- Pet deposit: USD 50.00 per stay

The above list may not be comprehensive. Mandatory hotel-imposed fees may not include tax and are subject to change.

## What else can we help you with?



✛ **Save on other Activities & Services** in Corpus Christi



- Sightseeing
- Dining options
- Ground transportation
- Attraction passes

⇨ Search for more Activities & Services

---

⇨ View your itinerary for complete and up-to-date trip details, or to make changes online.

## Customer Support

**Itinerary number: 12655059054**

If you have questions about your reservation, fill out our itinerary assistance form. We'll respond within 24 hours: For immediate assistance call Hotwire Vacations at 1-866-394-2015 for Vacation Packages support, 1-866-345-4007 for Activities support, or 001-817-983-0659 for international calls and have the itinerary number ready.

Thank you for choosing Hotwire Vacations.

http://vacation.hotwire.com

Monday, February 8, 2016 at 2:32:07 PM Eastern Standard Time

**Subject:** Your Thursday evening trip with Uber
**Date:** Thursday, January 28, 2016 at 11:57:24 PM Eastern Standard Time
**From:** Uber Receipts <receipts.washington.DC@uber.com>
**To:** Non- ████ @comcast.net Non- ████ @comcast.net>



U B E R                                                    JANUARY 28, 2016

# $11.75                          Thanks for choosing Uber, John

Non-Responsive, Irrelevant, and Personal Information

FARE BREAKDOWN

| | |
|---|---|
| Base Fare | 1.15 |
| Distance | 3.54 |
| Time | 1.71 |
| **Subtotal** | **$6.40** |
| Safe Rides Fee (?) | **1.35** |
| DCA Airport Surcharge (?) | **4.00** |

CHARGED
Non-Responsive, Irrelevant, and Personal Information          **$11.75**

| CAR | MILES | TRIP TIME |
|---|---|---|
| uberX | 3.47 | 00:10:02 |

You rode with MOHAMED                          RATE YOUR DRIVER

 Issued by Drinnen on behalf of Rasier



Uber Support

Contact us with questions about your trip.
Leave something behind? Track it down.

 Give $15, Get $15

Share code: hgpaz



Monday, February 8, 2016 at 2:33:22 PM Eastern Standard Time

**Subject:** Your Tuesday morning trip with Uber
**Date:** Tuesday, January 26, 2016 at 10:40:33 AM Eastern Standard Time
**From:** Uber Receipts <receipts.washington.DC@uber.com>
**To:** Non-████ @comcast.net Non-████ @comcast.net>

U B E R                                                                      JANUARY 26, 2016



# $14.45                                            Thanks for choosing Uber, John

Non-Responsive, Irrelevant, and Personal
Information

FARE BREAKDOWN

Base Fare                                    1.15
Distance                                     4.99
Time                                         2.86

**Subtotal**                                 **$9.00**

Safe Rides Fee (?)                           **1.35**
DC Taxicab Commission Fee (?)                **0.10**
DCA Airport Surcharge (?)                    **4.00**

CHARGED
Non-Responsive, Irrelevant, and             **$14.45**
Personal Information

| CAR | MILES | TRIP TIME |
| --- | --- | --- |
| uberX | 4.89 | 00:16:51 |

You rode with PATRICIA                                        RATE YOUR DRIVER

 Issued by Drinnen on behalf of Rasier

 **Uber Support**

Contact us with questions about your trip.

Leave something behind? Track it down.

 Give $15, Get $15

Share code: hgpaz



# TAB C

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| AMERICAN CIVIL RIGHTS UNION, | § | |
| in its individual and corporate capacities, | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No. 7:16-CV-00103 |
| | § | |
| ELECTION ADMINISTRATOR | § | |
| JOHN RODRIGUEZ, in his official | § | |
| capacity; and TEXAS SECRETARY OF | § | |
| STATE ROLANDO PABLOS, in his | § | |
| official capacity, | § | |
| *Defendants.* | § | |

## AFFIDAVIT OF JOHN RODRIGUEZ
## STARR COUNTY ELECTIONS ADMINISTRATOR

| | | |
|---|---|---|
| STATE OF TEXAS | § | |
| | § | KNOW ALL BY THESE PRESENTS: |
| COUNTY OF STARR | § | |

BEFORE ME, the undersigned authority, on this date appeared an individual identified to me as John Rodriguez, who upon his oath states and affirms as follows:

"My name is John Rodriguez. I am over the age of 18 years, of sound mind, and otherwise competent to make this Declaration. I declare under penalty of perjury that the foregoing is true and correct.

I am currently employed as the Starr County Elections Administrator. I have served in this post since May 4, 2017. Prior to being appointed as Starr County Elections Administrator, I was employed with the Starr County Elections Office for approximately 14 years. Prior to my appointment as Starr County Elections Administrator, that position was held by Mr. Rafael Montalvo, who died on April 9, 2017.

Starr County is an "online county" that shares its voter registration database with the Texas Secretary of State. Both the Texas Secretary of State and Starr County have access to Starr County's voter registration information and may remove voters from Starr County's voter roll. On a daily basis, Starr County receives information from the Texas Secretary of State regarding voters who may have moved to a new county, may have died, or may be a convicted felon. Starr County relies, in part, on the Texas Secretary of State to provide this information to the County.

Sometime after December 23, 2015, my office received a letter from the American Civil Rights Union (ACRU). This is the same letter attached to Plaintiff's Original and First Amended Petition. After receipt of this letter, Mr. Montalvo called Mrs. Susan Carleson, President of the ACRU, and discussed the concerns raised in the letter.

On January 27, 2016, Mr. John Mashburn, a representative of the ACRU, came to our office at the Starr County Courthouse Annex. At this meeting Mashburn requested copies of the documents listed in Plaintiff's December 23, 2015 letter. My office made copies of all requested documents and provided them to Mashburn. Mashburn looked through all of the copies while in Mr. Montalvo's office.  We provided him a binder of these copies for Mashburn to take with him. Mashburn stated that the documents looked to be in order, that there was no issue with the documents, and he declined to take copies with him. Mashburn then left our office. True and correct copies of these documents are attached to this affidavit as Exhibit A. Exhibit A was created on January 27, 2016 and was available for Mashburn to take with him prior to leaving our office. At no time did anyone at the Starr County Elections Administration Office tell Mr. Mashburn that he would not be provided copies of the documents he requested. After January 27, 2016, our office had no further contact with Mashburn or anyone from the ACRU until we were served with this lawsuit.

As of March 6, 2018, we have produced over 14,500 documents to the Plaintiff in this case. My office has opened as early as 7 AM and stayed open as late as 7 PM to provide as much time as possible for the review of documents by the Plaintiff. Our normal office hours are 8 AM to 5 PM. In total, I estimate that we have allowed for over 80 hours of document review by the Plaintiff.

All matters stated herein are true and correct to my personal knowledge."

_____
John Rodriguez

SUBSCRIBED AND SWORN TO before me on this the ___9___ day of March, 2018, by the said John Rodriguez.



ARMANDINA MARTINEZ
Notary ID #128367863
My Commission Expires
August 26, 2018

_____
Notary Public, State of Texas

# TAB D

268 F.Supp.3d 1328
United States District Court, S.D. Florida.

Andrea BELLITTO and American Civil Rights
Union, Plaintiffs,
v.
Brenda SNIPES, in her official capacity as the
Supervisor of Elections of Broward County,
Florida, Defendant,
v.
1199SEIU United Healthcare Workers East,
Intervenor Defendant.

Case No. 16–cv–61474–BLOOM/Valle
|
Signed 07/21/2017

### Synopsis

**Background:** Advocacy organization brought action against county's supervisor of elections, asserting violations of the National Voter Registration Act of 1993 (NVRA) and the Help America Vote Act.

**[Holding:]** On a sua sponte review of the record, the District Court, Beth Bloom, J., held that organization's notice to supervisor, concerning a potential NVRA violation for supervisor's alleged failure to make reasonable efforts to conduct voter list maintenance programs, did not provide the requisite notice of claim for failure to respond adequately to request for data, and thus, district court did not have jurisdiction to hear claim.

Ordered accordingly.

### Attorneys and Law Firms

H. Christopher Coates, J. Christian Adams, Public Interest Legal Foundation, Plainfield, IN, Joseph A. Vanderhulst, Kaylan L. Phillips, Public Interest Legal Foundation, Indianapolis, IN, Mathew Daniel Gutierrez, William Earl Davis, Foley, Lardner LLP, Miami, FL, Kenneth A. Klukowski, American Civil Rights Union, Alexandria, VA, for Plaintiffs.

Burnadette Norris–Weeks, Michelle Austin Pamies, Burnadette Norris–Weeks PA, Fort Lauderdale, FL, Kathleen Marie Phillips, Lucia Piva, Phillips, Richard,

Rind, P.A., Katherine Roberson–Young, SEIU, Miami, FL, Alvin Velazquez, Nicole G. Berner, Trisha Pande, Service Employees International Union, Catherine M. Flanagan, Michelle Kanter Cohen, Project Vote, Carrie F. Apfel, Jessica Ring Amunson, Marina K. Jenkins, Tassity S. Johnson, Jenner & Block LLP, Washington, DC, Cameron Bell, Scott Novakowski, Stuart C. Naifeh, Demos, David Slutsky, Levy Ratner PC, New York, NY, Kali N. Bracey, Jenner & Block LLP, Washington, DC, for Defendant and Intervenor Defendant.

### Opinion

**\*1330 ORDER**

BETH BLOOM, UNITED STATES DISTRICT JUDGE

**THIS CAUSE** is before the Court upon a *sua sponte* review of the record. On June 27, 2016, Plaintiff American Civil Rights Union ("Plaintiff" or "ACRU") and Andrea Bellitto ("Bellitto"),[1] one of ACRU's members, initiated these proceedings, bringing two claims against Defendant Brenda Snipes ("Defendant" or "Snipes"), the Supervisor of Elections of Broward County, Florida, under Section 8 of the National Voter Registration Act of 1993 ("NVRA"), 52 U.S.C. § 20507.[2] *See* ECF No. [1]. Under Count I of its Amended Complaint, ACRU claims that Snipes "has failed to make reasonable efforts to conduct voter list maintenance programs, in violation of Section 8 of NVRA, 52 U.S.C. § 20507 and 52 U.S.C. § 21083(a)(2)(A) [Help America Vote Act]." ECF No. [12] at ¶ 28. Under Count II of the Amended Complaint, ACRU claims that Snipes "has failed to respond adequately to Plaintiffs' written request for data, [and] failed to produce or otherwise failed to make records available to Plaintiffs concerning Defendant's implementation of programs and activities for ensuring the accuracy and currency of official lists of eligible voters for Broward County, in violation of Section 8 of the NVRA, 52 U.S.C. § 20507(i)." *Id.* at ¶ 33. This Order concerns Count II—in particular, whether at this late stage this Court has jurisdiction to adjudicate that claim in the first place. For the reasons explained below, the Court finds that it does not.

The genesis of this lawsuit stems from a brief series of interactions that took place between the President of ACRU, Susan A. Carleson ("Carleson"), and Snipes back in early 2016. Those interactions were detailed in a prior Order that this Court entered on July 11, 2017, *see* ECF No. [182] (the "July 11, 2017 Order"), which denied the

respective motions for partial summary judgment that had been filed by ACRU, Snipes, and Intervenor Defendant 1199SEIU United Healthcare Workers East,[3] *see* ECF Nos. [117], [145], [142]. **\*1331** Given their jurisdictional significance, the details of those interactions bear repeating here.

On January 26, 2016, Carleson sent a letter to Snipes notifying her that, based on ACRU's research, Broward County was "in apparent violation" of Section 8 of the NVRA. ECF No. [12–1]. The letter explained that based on ACRU's comparison of publicly available information, Broward County at the time "ha[d] an implausible number of registered voters compared to the number of eligible living citizens." *Id.* at 2. The letter expressed ACRU's hope that the Broward County Supervisor of Elections' Office ("BCSEO") would work towards compliance with Section 8 of the NVRA as well as ACRU's intention to file a lawsuit under the statute if such compliance was not achieved. *Id.* at 3. The letter also stated that if the information referenced therein was no longer accurate, "it would be helpful if [Snipes] could provide" certain categories of documents that the letter identified. *See id.* at 3–4. Citing Section 8 of the NVRA, the letter informed Snipes of the requirement that her office "make available for public inspection all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." *Id.* at 4. The letter invited Snipes to call Carleson in order to arrange a time to discuss the matter and to arrange an inspection. *Id.*

On February 8, 2016, Snipes responded to ACRU's letter with a letter of her own. *See* ECF No. [12–2] at 1–2. Among other things, Snipes' letter refuted the assertion that Broward County's voter rolls were filled with more voters than living persons residing in the county and included two types of BCSEO certifications spanning the previous several years—which the letter characterized as "documenting actions taken by [Snipes'] office to manage removal of voters no longer eligible to vote in Broward County." *Id.*; *see also id.* at 3–23. The letter closed by directing ACRU to BCSEO's General Counsel and BCSEO's website for any further information. *Id.* at 3. About two months after the exchange of letters, legal representatives of ACRU contacted Snipes via telephone on April 5, 2016, and the parties discussed the possibility of arranging a meeting as well as an inspection of the records ACRU requested in its January 26, 2016 letter. Those efforts proved unfruitful, however, as no further communications (at least not written) between ACRU and Snipes took place in the nearly three months that passed before this lawsuit was filed on June 27, 2016.

**[1]**As has been largely recognized throughout these proceedings, ACRU's January 26, 2016 letter is critical to jurisdiction in this case. By way of background, Section 20510 of the NVRA governs the civil enforcement of Section 8, providing for enforcement by:

(a) Attorney General—The Attorney General may bring a civil action in an appropriate district court for such declaratory or injunctive relief as is necessary to carry out this chapter.

(b) Private right of action—

1. A person who is aggrieved by a violation of this chapter may provide written notice of the violation to the chief election official of the State involved.

2. If the violation is not corrected within 90 days after receipt of a notice under paragraph (1), or within 20 days after receipt of the notice if the violation occurred within 120 days before the date of **\*1332** an election for Federal office, the aggrieved person may bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation.

3. If the violation occurred within 30 days before the date of an election for Federal office, the aggrieved person need not provide notice to the chief election official of the State under paragraph (1) before bringing a civil action under paragraph (2).

52 U.S.C. § 20510. As the Court explained earlier in these proceedings, "[t]his Court's jurisdiction, therefore, stems directly from § 20510(b), and Plaintiffs' standing to bring suit depends upon compliance with the statute." *Bellitto v. Snipes*, 221 F.Supp.3d 1354, 1360–61 (S.D. Fla. 2016). Consistent with that rationale, the Court granted in part a motion to dismiss filed by Snipes, dismissing only the claims brought by Bellitto as "Bellitto did not herself comply with § 20510(b)(1)'s notice prerequisite." *Id.* at 1363. Specifically, the Court explained that ACRU's January 26, 2016 letter "did not mention Bellitto 'by name' or even refer to ACRU members," and thus found that the letter was "too vague to provide ... *an opportunity to attempt compliance* as to [Bellitto] before facing litigation." *Id.* (emphasis added) (alteration in original) (quoting *Scott v. Schedler*, 771 F.3d 831, 836 (5th Cir. 2014)). As such, the Court held that Bellitto had "failed to meet her burden to establish standing to bring suit." *Id.* Of course, at that time there appeared to be no dispute between the parties that the January 26, 2016 letter was sufficient to confer standing on ACRU itself—after all, it was ACRU's letter—and this case proceeded accordingly.

However, in its July 11, 2017 Order, the Court identified the following concern with respect to the NVRA's pre-suit notice requirement as it related specifically to Count II:

> The parties appear to be in agreement that the January 26, 2016 letter constituted sufficient notice for purposes of ACRU's failure to disclose claim under Count II. Nonetheless, and despite the issue having not been raised on summary judgment or at any other time during these proceedings, the Court questions whether the letter can constitute sufficient notice for purposes of ACRU's claim for failure to make reasonable efforts to conduct voter list maintenance programs under Count I *and* ACRU's failure to disclose claim under Count II. Specifically, the letter contemplated one potential NVRA violation, the violation claimed under Count I. *See* ECF No. [12–1] at 2 ("[T]he list maintenance requirements of Section 8 of the NVRA [ ] ensure that ineligible voters are not participating in the political process.... The American Civil Rights Union has [ ] taken on the task of notifying you of your county's violation."). The letter did not contemplate the NVRA violation claimed under Count II, nor could it have; being the first correspondence between ACRU and Snipes, the letter represents the first time ACRU requested list maintenance records from Snipes. In other words, although the letter notified Snipes of a potential NVRA violation for her alleged failure to make reasonable efforts to conduct voter list maintenance programs, as far as public disclosure is concerned, the letter merely requested for the first time Snipes' list maintenance records. *See id.* at 4 ("We would like to discuss with your office how to implement a remedial plan which could cure what appears to be a violation of Section 8 of the NVRA. We *also request* the opportunity to inspect the list maintenance **\*1333** documents outlined above.") (emphasis added). It would seem to follow, then, that Snipes was never provided written notice of the potential NVRA violation claimed under Count II or afforded 90 days after such written notice by which to cure the potential violation—the lapse of which gives rise to the private cause of action. *See* 52 U.S.C. §§ 20510(b)(1), (2).

ECF No. [182] at 37–38 n.17 (emphasis in the original). The parties' apparent agreement as to the sufficiency of ACRU's notice letter for purposes of both Counts I and II notwithstanding, the Court now addresses its jurisdictional concern head-on. *See generally Miccosukee Tribe of Indians of Florida v. United States*, 698 F.3d 1326, 1332 (11th Cir. 2012) ("[E]very court has an independent duty to review standing as a basis for

jurisdiction *at any time*, for every case it adjudicates.") (quoting *Fla. Ass'n of Med. Equip. Dealers v. Apfel*, 194 F.3d 1227, 1230 (11th Cir. 1999)) (emphasis added); *Mulkey v. Land Am. Title Ass'n, Inc.*, 345 Fed.Appx. 525, 526 (11th Cir. 2009) ("Plaintiffs [bear] the burden of establishing jurisdiction; and a district court should not assume jurisdiction.") (citing *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 118, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998)); *Steel Co.*, 523 U.S. at 118, 118 S.Ct. 1003 (explaining that a court cannot assume jurisdiction to reach the merits of a case).

Following the Court's July 11, 2017 Order, and in anticipation of trial, the parties appeared before the Court at a pre-trial conference on July 18, 2017. In light of the above mentioned concern, the Court sought clarification from ACRU's counsel regarding the relationship between ACRU's notice letter and its failure to disclose claim under Count II. The following exchange ensued:

> The Court: I would like to address an issue relating to Count 2. And that is, I'm certain that the parties had an opportunity to review the Court's order relating to the cross-motions for summary judgment, as well as the motion for summary judgment as to Count 1. And my question is actually directed to the Plaintiff ACRU, and that is with regard to the notice that was provided relating to the lack of providing access to certain requested records. Were there any records that were requested before January 26th ...?

> Counsel: Your Honor, no. The first request was in the notice letter of January 26th.

> The Court: [B]oth sides have cited to the Kemp and Long cases in support of the summary judgment. And both of those cases, as we know, involved a refusal to allow access to certain requested records. And the notices in those cases were premised on that refusal that allow this 90–day period in which the defendant had to cure.

> Here, is it the Plaintiff's position that the January 26th, 2016 letter is, in fact, the notice?

> Counsel: Yes, it is, your honor.

Despite the significance of that clarification and the Court having clearly expressed its related jurisdictional concern in the July 11, 2017 Order, Snipes' counsel interjected, but only to reassert Snipes' position that she had been cooperative with ACRU's records requests all along.

[2] [3] [4] [5]In any event, under the circumstances of this case, that ACRU's notice letter admittedly provides no

Bellitto v. Snipes, 268 F.Supp.3d 1328 (2017)

notice of the specific failure to disclose violation claimed in Count II (because it instead represents the first time ACRU ever requested records from Snipes) is dispositive for purposes of jurisdiction as to Count II. In the **\*1334** Court's view, a plain reading of 52 U.S.C. § 20510 reflects that the pre-suit notice requirement thereunder is violation specific. *See* 52 U.S.C. §§ 20510(b)(1)–(2) ("A person who is aggrieved by *a violation* of this chapter may provide written notice of *the violation* to the chief election official.... If *the violation* is not corrected ..., the aggrieved person may bring a civil action ... for declaratory or injunctive relief *with respect to the violation*.") (emphasis added). That view is bolstered by consideration of the specific purpose of the notice requirement that is enumerated in § 20510—that is, to allow the potential NVRA defendant a curative period during which he or she may correct the violation identified, thereby coming into compliance with the NVRA. *See, e.g., Scott,* 771 F.3d at 836 ("It is also apparent to us that the NAACP's notice letter was too vague to provide [the defendant] with an opportunity to attempt compliance as to [the individual plaintiff] before facing litigation. In the letter, the NAACP alleged NVRA violations only in broad terms and certainly did not mention [the individual plaintiff] by name.... The letter's surveys and statistics put [the defendant] on notice neither that the violations concerned the declination form nor that they involved [the individual plaintiff].") (internal citation and quotation marks omitted). Inescapably, that curative period is likewise violation specific. It is not enough that a potential NVRA defendant has general notice that an individual or organization believes it to be in violation of the NVRA before facing litigation. *See Judicial Watch, Inc. v. King,* 993 F.Supp.2d 919, 922 (S.D. Ind. 2012) (explaining that an NVRA notice is sufficient if it "sets forth the reasons for [the] conclusion" that a defendant failed to comply with the NVRA). Similarly, notice as to one potential NVRA violation is not the equivalent of notice as to all potential NVRA violations. Rather, a potential NVRA defendant must have notice of exactly what violation or violations have been alleged in order to have a meaningful opportunity to attempt complete compliance before facing litigation.[4]

[6]In this case, ACRU alleges two separate and distinct violations of the NVRA. However, ACRU has in essence sought to "piggyback" its claim under Count II on its January 26, 2016 notice letter, which only provides notice of the NVRA violation alleged in its claim under Count I. *Scott,* 771 F.3d at 836 (holding that the individual plaintiff could not "piggyback" **\*1335** on the NAACP's notice letter). Put simply, although the letter notified Snipes of a potential NVRA violation for her alleged failure to make reasonable efforts to conduct voter list

maintenance programs (Count I), as far as public disclosure is concerned, the letter merely requested for the first time Snipes' list maintenance records. *See* ECF No. [182] at 37–38 n.17. It follows, then, that Snipes was never provided with written notice of the potential NVRA violation claimed under Count II. Equally important, Snipes was not afforded the curative period following such written notice by which to cure that potential NVRA violation.

[7]The point is neatly illustrated by *Project Vote, Inc. v. Kemp,* 208 F.Supp.3d 1320 (N.D. Ga. 2016), a case which ACRU relied upon extensively in seeking summary judgment on Count II, though on issues unrelated to notice. The only claim brought by the plaintiff in *Kemp* was a failure to disclose claim under the NVRA, and at issue was the sufficiency of the plaintiff's notice letter. The plaintiff had requested from the defendant a variety of records on October 30, 2014. *Id.* at 1347. Thereafter, the defendant produced certain records in response, but the plaintiff viewed that production as inadequate. *Id.* Importantly, the plaintiff's request and the defendant's response *preceded* the notice letter that plaintiff sent the defendant on July 6, 2015—"nearly a year before th[e] action was filed[.]" *Id.* In finding that the plaintiff's notice letter satisfied the notice requirement of 52 U.S.C. § 20510(b)(1), the court observed that the notice letter "described the records Plaintiff requested on October 30, 2014 *and sought to explain why Defendant's productions failed to satisfy those requests*[,]" such as the fact that the defendant's productions omitted a number of documents. *Kemp,* 208 F.Supp.3d at 1347–48 (emphasis added). Here, by contrast, there was never any request for records by ACRU—and by extension a response to such request by Snipes—prior to ACRU's notice letter. Instead, as counsel for ACRU stated at the pre-trial conference, "the notice was the request." However, to allow a purported NVRA notice letter to serve such a dual purpose—that is, make an initial request for records and at the same time notify the records keeper of his or her failure to satisfy that request—simply because it provides sufficient notice of a separate NVRA violation would, in the Court's view, defy logic and frustrate the purpose of the NVRA's notice provision (to provide an opportunity to attempt compliance before litigation).[5]

[8]For all of these reasons, the Court finds that although ACRU's notice letter constitutes sufficient notice for purposes of ACRU's claim for failure to make reasonable efforts to conduct voter list maintenance programs under Count I, the notice letter does not constitute sufficient notice for purposes of ACRU's failure to disclose claim under Count II. As ACRU's notice letter represents the only written correspondence that ACRU provided Snipes

prior to the commencement of this lawsuit,[6] *1336 Snipes was never provided written notice of the potential NVRA violation claimed under Count II, nor was she afforded 90 days after such written notice by which to cure that potential violation—as required under 52 U.S.C. §§ 20510(b)(1), (2). Furthermore, because it is the lapse of the curative period contemplated in 52 U.S.C. § 20510(b)(2) that gives rise to the private cause of action, no standing was ever conferred upon ACRU to bring its failure to disclose claim—its standing to bring the claim for failure to make reasonable efforts to conduct voter list maintenance programs notwithstanding. *See Scott*, 771 F.3d at 835 ("No standing is therefore conferred if no proper notice is given, since the 90–day period never runs.") (quoting *Georgia State Conference of NAACP*, 841 F.Supp.2d at 1335); *see also Lewis v. Casey*, 518 U.S. 343, 358 n.6, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) ("[S]tanding is not dispensed in gross."); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) ("[A] plaintiff must demonstrate standing separately for each form of relief sought."). Consistent with both the Fifth Circuit in *Scott* and the Northern District of Georgia in *Georgia State Conference of NAACP*, and as the Court has previously explained during these proceedings, this lack of standing has a preclusive effect on this Court's jurisdiction. *See Bellitto*, 221 F.Supp.3d at 1362 ("The plaintiff has the burden to clearly and specifically set forth facts sufficient to satisfy Art. III standing requirements. In the context of standing to bring a private action pursuant to 52 U.S.C. § 20510(b), failure to provide notice is fatal.") (quoting *Sierra Club v. Morton*, 405 U.S. 727, 731–32, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), and *Scott*, 771 F.3d at 836) (internal citation and quotation marks omitted).

Accordingly, it is **ORDERED AND ADJUDGED** that **Count II** is **DISMISSED.**

**DONE and ORDERED** in Miami, Florida, this 21st day of July, 2017.

**All Citations**

268 F.Supp.3d 1328

Footnotes

1    All claims brought by Bellitto have since been dismissed based on Bellitto's lack of standing to bring suit. *See* ECF No. [64].

2    The Court refers to 52 U.S.C § 20507 interchangeably as "Section 8," reflecting the statute's original location at Section 8 of Pub. L. 103–31, May 20, 1993, 107 Stat. 77.

3    The Court previously granted a motion to intervene filed by Intervenor Defendant 1199SEIU United Healthcare Workers East. *See* ECF Nos. [23], [29], [53].

4    Though the Eleventh Circuit has not addressed this issue within the context of the NVRA, it has expounded upon the opportunity to comply that is mandated in the similarly worded pre-suit notice requirement for citizens suits under the Clean Air Act. In *Nat'l Parks & Conservation Ass'n, Inc. v. Tennessee Valley Auth.*, 502 F.3d 1316, 1328 (11th Cir. 2007), the Eleventh Circuit agreed with the district court that the notice letter provided by the plaintiff organization was "the notice equivalent of a 'shotgun' complaint because it broadly alleged daily violations of an entire set of regulations without specifically identifying the individual alleged violations and dates." (internal quotation marks omitted). The Eleventh Circuit reasoned:

> We conclude, as the district court did, that National Parks' notice letter was inadequate because it failed to provide enough information to permit TVA to identify the allegedly violated standards, dates of violation, and relevant activities with the degree of specificity required by the regulations. *The notice requirements are strictly construed to give the alleged violator the opportunity to correct the problem before a lawsuit is filed.*

*Id.* at 1329 (emphasis added). Like the notice requirement of the Clean Air Act, "[t]he apparent purpose of the [NVRA] notice provision is to allow those violating the NVRA the opportunity to attempt compliance with its mandates before facing litigation." *Georgia State Conference of NAACP v. Kemp*, 841 F.Supp.2d 1320, 1335 (N.D. Ga. 2012).

5    To illustrate the point further, a sufficient notice letter with respect to Count II in this case could have been a second letter sent by ACRU in which ACRU expressed its position that the BCSEO certifications provided by Snipes in her February 8, 2016 response letter did not satisfy all of the requests ACRU made in its initial January 26, 2016 letter. The subsequent attempt (or non-attempt) for compliance by Snipes would have then occurred prior to litigation, rather than after the commencement, and throughout the course, of litigation—as has been the case here. The NVRA's notice requirement contemplates the former.

Bellitto v. Snipes, 268 F.Supp.3d 1328 (2017)

6    The parties established this in their respective renditions of the undisputed material facts that they submitted in support of summary judgment.

---

**End of Document**                                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

---

# TAB E

**REGISTRATION**

1. Is the registration data correct?

   *In Mr. Montalvo's view (and his assistant John's view) – yes. The records are all computerized now, whereas when he took over in 2005 all voter registration was documented by hard copy record keeping, etc.*

2. Do you have different populations numbers in the county than we do?

   *He agreed the adult population was around 62,000 – the same as indicated by the Census Bureau.*

3. Why do you think registrations exceed citizen population?

   *Mr. Montalvo and his assistant were incredulous that the Census Bureau says that almost 40,000 of the adults in Starr County are non-citizens – and they really questioned how (by what method) the Census Bureau could actually come up with such a large number of non-citizens in the county's overall adult population.  Therefore they do not think the roughly 30,000 voters presently registered exceed the actual Citizen Voting Age Population total in the county.*

4. How much HAVA money do you have for list maintenance left?

   *According to Mr. Montalvo, the county has not received any HAVA money since the 2005-2006 timeframe when the county received money to buy new voting machines and computers in order to computerize the county's voter registration record keeping system.   The county does receive Chapter 19 money from the state to pay for TEAMs transactions and to provide services to disabled voters.*

5. How many people work on voter registration removal and whether they work part time or full time on voter registration?

   *Mr. Montalvo wears several hats in the county in addition to overseeing the voter registration system. He is the Director of Starr County Human Resources, and Director of Federal and State Programs (including state housing assistance programs.) His assistant John ? was said to do most of the actual work overseeing the voter registration program with the aid of 2 full time workers and 1 part-time worker.*

6. What type of training they receive?  Whether they would be willing to seek training for all the people who work on voter registration in his office.

   *Mr. Montalvo says that TEAMS in Austen provides training for voter registration workers 2 to 3 times a year and he and his assistant John alternate going, and taking one of the 2 full-time workers with them when they go for the training.*

7. How many ineligible voters removed each year?  By cycle?

   *208 deceased voters and 62 felons were removed form the rolls in 2015. No voters were removed based on NCOA data (see NCOA section for more detail.)  Voters were also removed per instructions from TEAMS. They did not have a breakdown as to how many and for what reason. They said such records were available from TEAMS for 2015, but not for periods prior to that because such data is no longer kept by the Texas Sec. of State as result of the switchover from Teams 1 to Teams 2 in 2015 (see section on TEAMS/Texas SOS.)*

**MAILINGS - CHANGE OF ADDRESS**

8.   When was the last time you did a county wide mailing to all voters and utilized return data to affect list maintenance?

> *Mr. Montalvo stated that once per election cycle the office mails out voter registration/identification cards to all voters. Voters whose cards are returned as undeliverable ("come back") are then sent a notice (unclear if notices are sent forward-able or unforward-able) giving voters 30 days to respond to the notice to verify their address and registration information. If voters do not respond to the notices, then a voter's name is immediately removed from the voter rolls.*

9.   When was the last time you did a direct mailing to National Change of Address (NCOA list from USPS) names from your county asking them to cancel their registration?

> *The office does not use the NCOA database at all and relies on voters themselves contacting the office and TEAMS to provide lists of voters who have changed addresses within the county or moved out of the county entirely. When voters move and register in another county, the local registrars in the new county send a notice to TEAMS about the new registration and TEAMS notifies Starr County and the voter is then removed from the rolls.  (Unclear if a notice is sent to the voter by Starr County first, but implication was that voters are removed immediately based on action requests from TEAMS.)*

10.  Do you use the NCOA database?

> *No. (see question 9 above.)*

11.  How regularly do you use updated NCOA data?

> *Never. (see question 9 above.)*

> *Mr. Montalvo also noted that the local Post Office is not very cooperative or helpful. He stated that he had had concerns about returned mail-in ballots being at risk in a single mailman's truck. He had volunteered to retrieve the ballots at the Post Office itself with an escort but was told the ballots had to be delivered via the postal service under regular procedure for mail delivery.*

12.  Does the office send a notice letter to registrants for inactivity?

> *Office does not send notices or remove voters for failure to vote in previous elections, no matter how long since voter last voted.*

13.  How many election cycles before a name is removed?

> *Office does not send notices or remove voters for failure to vote in previous elections, no matter how long since voter last voted*

14.  Are there lists of those letter recipients by cycle?

> *No letters sent, so no records/lists.*

15.  What is the process used for removing a voter registration when no response received?

> *If voters do not respond to notices from the registrar's office, then a voter's registration is cancelled immediately.*

**DEATH INDEX**

16. Do you purchase the Social Security Death Index?

    *No. Index information is unreliable.*

17. How often – when, and what is done regarding names listed on the index?

    *Index not used. Voters identified as deceased by TEAMS or county coroner's office are removed from rolls immediately.*

18. Do you scrub your registered voter names against that list?

    *Index not used.*

19. How do you obtain death records?

    *County depends on TEAMS to provide list of registered voters that have died OUTSIDE the county. Registrar's office obtains lists of death certifications from the county coroner's office for residents that die WITHIN the county.*

20. Do you talk to the Hernandez Funeral Home? Who there?  The Sanchez funeral home?  Who there?

    *No. Registrar's office obtains list of death certifications from the county coroner's office for residents that die WITHIN the county.*

21. What about the Rivera Funeral Home in McAllen, or the Ceballos Funeral Home in McCallan (Neighboring county but still relevant).

    *County depends on TEAMS to provide list of registered voters that have died OUTSIDE the county.*

22. Do you use EVE or STEVE databases (Electronic Verification of Vital Events which is run by a state consortium)?

    *No. Never heard of either database.*

ACRU - 000768

**JURY DECLINATIONS**

23.  Do you get any communications from the district court clerk about jury declinations?

*No – not worthwhile. Overwhelming majority of residents who decline jury duty in the county do so on the basis that they do not speak English, rarely do they decline by acknowledging they are not a U.S. citizen.*

24.  Do you obtain the jury declination list from the US District Court in McAllen? Have you asked?

*No – again, not considered worthwhile. Overwhelming majority of residents form the county who decline jury duty in federal court do so on the basis that they do not speak English, rarely do they decline on by acknowledging they are not a U.S. citizen.*

ACRU - 000769

**NON-CITIZEN VERIFICATION**

25. Have you requested use of the SAVE (Systemic Alien Verification for Entitlements) database?

    *No – never heard of the database.*

26. Do you possess a record of people who use the federal form – and state/local form – and indicate they are not citizens or leave the check box blank?

    *State voter registration form is used – which has a check box for U.S. citizenship. Voter registration forms filled out in local government offices or mailed to the registrar's office are processed by the county registrar's office. However, forms filled out at the local DPS driver's license bureau are sent to Austen and processed by TEAMS and the county is then instructed to register the individual to vote only if the form is "fully/completely filled out."  If an indication is made that an applicant is not a U.S. Citizen, they are not registered to vote. If the box for citizenship is not checked, the individual is not registered until the form is "fully/completely filled out."*

    *Mr. Montalvo also noted that because the voter registration forms filled out at the local DPS are sent to Austen, their office never sees the forms and thus they never get a copy of the signature on the voter registration application form to be able to cross check it with the signature of the individual voting on election day for verification purposes.*

27. What do you do when someone leaves the citizenship checkbox blank?  Do you register them pending confirmation, send a confirmation inquiry, or refuse to register with no action or some other action?

    *If the box for citizenship is not checked (left blank), the individual again is not registered to vote until the form is "fully/completely filled out."  The county then sends the applicant a notice at the address listed informing them that their registration to vote cannot be completed nor their name entered on the voting rolls until the application form is " fully/completely filled out." If the applicant does not respond to the notice, or otherwise does not  "fully/completely fill out" the application form (i.e. by leaving the citizenship box unchecked) then the applicant is not registered to vote.*

    *In a phone call prior to visiting Starr County, Mr. Montalvo mentioned that <u>many non-citizens would have an incentive to check the citizenship box</u> because they can then use the voter ID card they would then receive as one of the two forms of ID required by border officials to allow them to cross back and forth across the border with Mexico.*

**PROSECUTION - FELONS**

30. Do you have records of federal prosecutions from the US Attorney in McAllen?  How frequently are they sent?  Do you check the addresses of individuals convicted of immigration trafficking against registrants in those same households?

> *The office gets a list of felony convictions from the county court each month to check against the voter rolls. TEAMS is relied on to provide information about county residents convicted of felonies OUTSIDE the county, including convictions in federal court in McAllen and all other cities and states.*
>
> *They do not focus on the specific nature of a crime for which an individual is convicted (such as immigration trafficking) and do not check for other registered voters living at the same address as an individual who is convicted of any felony charge.*

ACRU - 000771

**TEXAS SOS OFFICE INFO**

31. What is the average time to act on Texas Election Administration Management (TEAM) "hopper" items from the TX SOS – action items sent to be checked out?

    *As soon as possible, immediately most of the time.*

32. Have they urged you to improve procedures?

    *No.*

33. Do you possess records showing all TX SOS suggestions and the action taken on them?

    *For the last year yes, prior to that no. Everything is on computer, but the Texas Sec. of State's office switched from "TEAMS 1" to "TEAMS 2" last year and such archival records in the county's TEAMS account (and for all other counties) based on the TEAMS 1 system era were deleted from the county's account. Not sure if Texas SOS archived the info, but county does not have access to it.*

34. Do you possess the invoices from the TX SOS billing you for each list maintenance transaction over the last few years? (TX SOS charges like 10 cents per removal).

    *For the last year yes, prior to that no. (see answer to question 33.)*

35. Is the Texas Vital Records database used to cross check for names? (This is different than TEAMS).

    *Their understanding is that the state vital records office provides such info to the TEAMS database office and the county relies on the TEAMS system for such info.*

**REFERRALS FOR PROSECUTION**

37. How many instances of noncitizen voting have you had?  Any investigations from your office?

    *Mr. Montalvo does not believe there have been any instances of non-citizen voting since the registration records have been computerized and kept up to date. However, he volunteered that the first year he took over the office in 2005-2006, nine people were "indicted" for facilitating or committing vote fraud.  Another individual is similarly indicted every year or so, but not on the basis they are not U.S. citizens.*

38. Have you asked the TX SOS for additional help or HAVA money to fix this?

    *No. They do not think it is a big problem in the county now that the voter rolls have been computerized, and because the past prosecutions have deterred such fraudulent voting behavior.*

39. How many referrals have you made for people who improperly registered to county or state criminal prosecutors?

    *Mr. Montalvo volunteered that the first year he took over the office in 2005-2006, nine people were "indicted" for facilitating or committing vote fraud.  Another individual is similarly indicted every year or so. They generally report clearly proven cases to the local DA, but if it involves local officials, political party officers, or others that would present a conflict of interest for the local DA, they refer the cases to the Texas AG's office.*

ACRU - 000773

**WRITTEN PLAN TO RESOLVE ISSUES**

41.  WILL YOU ENTER INTO A WRITTEN PLAN AGREEING TO FIX ANY SHORTCOMINGS WE DISCUSSED TODAY?

42.  WILL YOU AGREE IN WRITING TO START TO DO QUESTION _____ ?

*Mr. Montalvo stated that he would be open to doing things to improve their registration processes, but that it would of course be subject to approval by the County Commissioners, as well as the County Judge who has oversight and control of the financial budget for his office. His main concern was who would pay for access to the mentioned databases and the training for county staff to be able to use them properly.*

*He noted that Starr is a very poor county with many residents who do not speak English and/or less educated than in other parts of the state. As a result they do not have the resources to devote to voter registration issues on a par with other counties, which is why they rely so heavily on the state funded and controlled TEAMS system for much of their voter registration needs for information and tracking.*

*He acknowledged that TEAMS is often slow ("Sometimes it can take several months for the info to come through to the county.") and that the information is not always accurate.  He noted that neighboring Hidalgo County is more prosperous and uses the private "Vote Tech" database which is quicker and more accurate than TEAMS – but much more expensive.*

ACRU - 000774